[No. 51118–7.   En Banc.   January 16, 1986.]

DAVID JENKINS, *as Guardian ad Litem, Appellant,*
v. SNOHOMISH COUNTY PUBLIC UTILITY
DISTRICT NO. 1, *Respondent.*

*Greive & Law,* by *Robert R. Greive* and *Timothy A. Law,* for appellant.

*Anderson, Hunter, Dewell, Baker & Collins, P.S.,* by *William W. Baker,* for respondent.

UTTER, J.—The Jenkins, plaintiffs below, appeal an additur by the trial judge after a jury verdict which he found to be based on passion and prejudice. In support of their appeal they claim error in the admission of three items of evidence: the deposition of a child, testimony regarding parental negligence, and a video reenactment of the accident. Respondents cross–appeal from the judge's removal of the issue of parental negligence from the jury and his grant of an additur without the alternative of a new trial. We grant a new trial inasmuch as the trial judge erred as a matter of law in admitting the deposition of a child who was under 10 years of age and not shown to be competent. We also order exclusion on retrial of the evidence relating to parental negligence.

David and Barbara Jenkins brought suit on behalf of their son, Jonathan, and themselves for injuries suffered by Jonathan, who, when he was 7, climbed the fence of a Snohomish County Public Utility District (PUD) substation near Stanwood, Washington, in 1981. As a result of his injuries, Jonathan's right arm was amputated below the elbow.

A verdict for the Jenkins of $10,000 in special damages and $20,000 in general damages was returned. This included a reduction of both awards by 75 percent for contributory negligence on Jonathan's part. The trial judge granted an additur, noting that he believed he had erred in admitting evidence during the trial regarding Jonathan playing in the vicinity of the neighborhood gas station, and a statement that Jonathan had been told not to play near railroad tracks. This evidence, he believed, had inflamed

the jury and caused it to find greater contributory negligence than warranted. The evidence had been admitted in support of the PUD's affirmative defense of parental negligence.

I

The trial judge admitted a deposition given by Lance Sinka. Lance was 6 at the time of the accident and was with Jonathan when he climbed the fence at the power station. He gave his deposition a year after the accident. Because he was unavailable for trial, the court, over the objection of the Jenkins, admitted his deposition. In the deposition Lance stated he had warned Jonathan not to go into the substation because there was electricity and it was dangerous. In the same deposition, however, he also stated he did not know about electricity until after the accident.

The admission of testimony by children under 10 is within the discretion of the trial court. *Laudermilk v. Carpenter,* 78 Wn.2d 92, 102, 457 P.2d 1004 (1969). Under Washington law children under 10, who appear incapable of receiving just impressions of the facts respecting which they are examined, or of relating them truly, are not competent to testify. RCW 5.60.050(2). Children are not disqualified from testifying simply because of age.

The test to determine child competency is set out in *State v. Allen,* 70 Wn.2d 690, 692, 424 P.2d 1021 (1967). The 5–part test states the child must exhibit (1) an understanding of the obligation to speak the truth on the witness stand; (2) the mental capacity at the time of the occurrence concerning which he is to testify to receive an accurate impression of it; (3) a memory sufficient to retain an independent recollection of the occurrence; (4) the capacity to express in words his memory of the occurrence; and (5) the capacity to understand simple questions about it. This test, read in conjunction with the statute, must be applied by the trial court to determine whether the child witness is competent to testify. *State v. Ryan,* 103 Wn.2d 165, 172, 691 P.2d 197 (1984).

■ Because Lance Sinka was unavailable to testify in person, the court found him competent solely on the basis of the contents of the deposition. While it is within the trial court's discretion to determine competency, where, as here, the trial court makes its determination on documentary evidence in the record rather than on personal observation of the witness, this court may review de novo the trial court's finding. *Smith v. Skagit Cy.*, 75 Wn.2d 715, 453 P.2d 832 (1969).

The deposition makes clear that Lance understood his obligation to tell the truth and that he knew the difference between truth and falsehood. In addition, there is no doubt that Lance had the mental capacity to receive an accurate impression and to understand simple questions, and the ability to express his recollection in words.

Lance described the accident by stating that Jonathan went into the power station first, even though Lance told him it was "real." He said he told Jonathan to get down, yelled at him because "there was electricity on all of them, all kinds of electricity." Deposition of Lance Sinka, at 7. Then, in relation to the danger of the substation, he described wires hooked to light and telephone poles which hook onto the electricity at the power plant. In answer to the question "Why did you try to warn him?" he answered "Because that's real electricity, and it could really hurt someone real bad." Deposition, at 11. Toward the end of the deposition, in response to another question, however, Lance said he only learned of electricity after the accident.

■ The deposition itself shows that Lance did not have a memory sufficient to retain an independent recollection of the occurrence. The trial judge, recognizing the internal contradiction, decided that the contradiction went to the credibility of the evidence rather than to its admissibility, analogizing to the method of analysis with regard to inconsistent evidence given by adults.

The Legislature and the courts have recognized that child witnesses present special problems. Consequently, each element of the *Allen* test is critical to a determination

of competency. The absence of one of the elements gives rise to legitimate questions about the child's mental ability to grasp or recall the incident or the child's recognition of the importance of a legal proceeding, factors taken for granted with adult witnesses. The absence here of one of the elements is fatal to a finding of competence.

Had the judge subsequently seen Lance, and had the PUD attorney through questioning been able to demonstrate Lance's ability to independently recollect the accident, the contradictions in the deposition *would* go to credibility rather than admissibility. However, since the deposition was the only information the judge had on which to rely, and because the deposition clearly demonstrated that one of the five elements critical to a determination of child competency was absent, as a matter of law Lance Sinka was incompetent and admission of his deposition was error.

This error was extremely prejudicial to Jonathan's case. In evaluating contributory negligence with respect to children the jury is asked to decide whether a child of similar age and intelligence would have acted similarly. Lance was younger than Jonathan. If Lance knew the substation was dangerous and had even warned Jonathan of the danger, it would be reasonable for the jury to conclude Jonathan knew or should have known of the danger and disregarded it. Consequently, the deposition pertained to an issue central to the PUD's defense of contributory negligence on Jonathan's part and to the jury's analysis. The fact that the portion of the deposition leading to the conclusion of incompetence involves the very same issue, compounds the prejudice. No instruction could have cured an error of such a prejudicial nature. We therefore order a new trial.

## II

During the trial the PUD submitted evidence that David and Barbara Jenkins negligently supervised Jonathan and were, as a consequence, liable for his injuries. The trial judge admitted several pieces of evidence in support of

parental negligence but at the end of the trial took the issue from the jury. Both the Jenkins and the PUD have appealed, the Jenkins to keep the evidence out, the PUD to permit the issue to go to the jury.

Historically, the parental immunity doctrine has been based on the public policy interest in maintaining family tranquility, fear of undermining parental control and authority, an interest in assuring that family property be shared by all rather than appropriated by one family member, fear of collusion and fraud, and a view of the parent–child relationship as analogous to the husband–wife relationship.

Although the doctrine of parental immunity was widespread in the past, some states have eliminated it altogether. *See, e.g., Gibson v. Gibson,* 3 Cal. 3d 914, 479 P.2d 648, 92 Cal. Rptr. 288 (1971) (applying a reasonable and prudent parent test). Others have limited *its* application. *See, e.g., Goller v. White,* 20 Wis. 2d 402, 122 N.W.2d 193 (1963) (retaining parental immunity only where the act involves (1) exercise of parental authority, or (2) exercise of ordinary parental discretion with respect to provision of food, clothing, housing, medical and dental services and other care). A third approach separates parental supervision from other types of parental negligence and then upholds parental immunity where the parent's act was one of simple negligence, while delineating that parents are not immune from willful or wanton failure to supervise a child. *Foldi v. Jeffries,* 93 N.J. 533, 461 A.2d 1145 (1983).

This court has generally found parental immunity for negligent supervision, *Cox v. Hugo,* 52 Wn.2d 815, 329 P.2d 467 (1958), but has recognized exceptions to the parental immunity doctrine. *Merrick v. Sutterlin,* 93 Wn.2d 411, 610 P.2d 891 (1980) (no parental immunity when a child is injured as the result of negligent driving by a parent); *Hoffman v. Tracy,* 67 Wn.2d 31, 406 P.2d 323 (1965) (no parental immunity when a child is injured because a parent abdicated parental responsibility by driving while intoxicated); *Borst v. Borst,* 41 Wn.2d 642, 251 P.2d 149 (1952)

(no parental immunity when a child suffers injury due to parental negligence when the parent is acting in his business capacity).

Washington has continued to follow the rule of parental immunity where the parent may have been negligent but was not engaged in willful misconduct. *See Stevens v. Murphy,* 69 Wn.2d 939, 421 P.2d 668 (1966). There the court observed that although the father's act of turning into oncoming traffic was gross negligence, it was not willful misconduct since it was neither deliberate, intentional, nor wanton conduct with knowledge or appreciation of the fact that danger was likely to result. *Stevens v. Murphy,* 69 Wn.2d at 948. Likewise, the court held in *DeLay v. DeLay,* 54 Wn.2d 63, 337 P.2d 1057 (1959) that where a parent is acting in his parental capacity and injury occurs to a child, the child may not sue the parent.

The New Jersey Supreme Court has recently expressed well the reasoning relevant to a continuation of the parental immunity doctrine in parental negligence cases absent willful or wanton parental misconduct. *Foldi v. Jeffries, supra.* The *Foldi* court observed that there are certain areas of activities within the family sphere involving parental discipline, care and control that should remain free of judicial activity. "Parents should be free to determine how the physical, moral, emotional, and intellectual growth of their children can best be promoted." *Foldi,* 93 N.J. at 545, 461 A.2d at 1152. Parents should not routinely have to defend their child–rearing practices where their behavior does not rise to the level of wanton misconduct. There is no correct formula for how much supervision a child should receive at a given age. "What may be perfectly safe to entrust to one five year–old may be utterly dangerous in the hands of another child of the same age." *Foldi,* 93 N.J. at 546, 461 A.2d at 1152.

There is, however, a point at which parental neglect properly becomes a matter of public concern. With this in mind, our rule remains that where parental negligence rises to the level of willful or wanton misconduct, the doctrine of

parental immunity will not preclude liability. Willful and wanton misconduct falls between simple negligence and an intentional tort. It is sufficient that the actor "know, or has reason to know, of circumstances which would bring home to the realization of the ordinary reasonable [person] the highly dangerous character of his conduct." *Foldi v. Jeffries,* 93 N.J. at 549–50, 461 A.2d at 1154. *See also Stevens v. Murphy,* 69 Wn.2d at 948.

The record does not disclose that the Jenkins' supervision, or lack thereof, as presented by the evidence, rose to the level of willful or wanton misconduct. "Since 'differences in gravity of fault cannot be stated with mathematical precision,' the focus must be on the 'seriousness of the actor's misconduct.'" *Foldi v. Jeffries,* 93 N.J. at 550, 461 A.2d at 1154. David Jenkins had seen Jonathan within a few minutes of the accident. He regularly kept track of Jonathan's comings and goings, watched him cross the street, generally knew where he was and knew that when he was playing with Lance at Lance's mother's store, there was parental supervision. There is no evidence that David or Barbara Jenkins knew of the existence of the power substation or knew that Jonathan had ever been there before or on the day of the accident. No evidence exists that the Jenkins were reckless or indifferent with regard to Jonathan's welfare or that there was wanton or willful misconduct by them with regard to supervision of Jonathan either in general or in this particular instance. The admission of evidence that Jonathan's parents received a warning from the local police, that people had complained about Jonathan playing in the vicinity of the gas station, that Jonathan had been warned not to play on the railroad tracks by Lance's mother, and that Jonathan was a discipline problem in one class at school, was error as a matter of law. Even in total these pieces of evidence do not rise to the level of willful and wanton misconduct.[1]

---

[1]The evidence is also inadmissible under ER 404(a) and (b).

### III

The PUD made a video recording of a boy about Jonathan's age and size climbing into the substation, twisting dials, opening cabinets and beginning to climb on the equipment. The video shows a boy climbing over the gate Jonathan climbed over, one with 3– by 5–inch mesh and no barbed wire. In addition, it shows the same boy climbing over other portions of the fence made of smaller mesh with barbed wire across the top. The court instructed the jury to consider the video only with relation to the physical deterrent aspect of the fence with and without the barbed wire. The Jenkins objected to admission of the video.

██ Use of demonstrative evidence has been encouraged if it accurately illustrates facts sought to be proved. *Knight v. Borgan,* 52 Wn.2d 219, 324 P.2d 797 (1958). The evidence must be relevant by being material and probative. Admission of demonstrative evidence is within the trial court's discretion. *Knight v. Borgan, supra* at 230. The conditions of the experiment must be substantially similar to those of the event at issue, but any dissimilarity goes to the weight of the evidence, to be evaluated by the jury. *Nordstrom v. White Metal Rolling & Stamping Corp.,* 75 Wn.2d 629, 453 P.2d 619 (1969). "The ultimate test for the admissibility of an experiment as evidence is whether it tends to enlighten the jury and to enable them more intelligently to consider the issues presented." *Sewell v. MacRae,* 52 Wn.2d 103, 107, 323 P.2d 236 (1958).

When demonstrative evidence is likely to confuse the jury, raises collateral issues or is more prejudicial than probative, courts should refuse its admission. Courts may consider, with regard to the issue of prejudice, whether the evidence is merely cumulative and illustrative of issues already introduced and therefore not prejudicial or whether it is unique evidence of a factual assertion and potentially prejudicial. If evidence is admitted, the court must be careful to explain differences in conditions between the posed evidence and the situation sought to be reconstructed in order to minimize the prejudice or cure misrepresentations.

The video prepared by the PUD was not an exact representation of events as they occurred when Jonathan and Lance went to the substation. Conditions were similar and the differences were explained to the jury. The evidence was relevant to the assertion of one of the Jenkins' witnesses who claimed that barbed wire on the gate would probably have prevented the accident. Caution was urged, however, to the jury to consider the tape only with relation to the physical deterrent aspect of the barbed wire. The Jenkins contend in any event that it is prejudicial since it permitted the jury to speculate what might have happened had there been barbed wire around the entire enclosure. While sympathetic to the Jenkins' concerns, we will not substitute our views for that of the trial court and we cannot say as a matter of law that the trial court abused its discretion.

Inasmuch as we have ordered a new trial based on the erroneous admission of Lance Sinka's deposition, we need not reach the Jenkins' appeal of the trial judge's additur nor the PUD's cross appeal on that issue.

The trial court judgment is reversed and the case is remanded for a new trial.

DOLLIVER, C.J., BRACHTENBACH, DORE, and PEARSON, JJ., and CUNNINGHAM, J. Pro Tem., concur.

DURHAM, J. (concurring in part, dissenting in part)—I agree that this case should be remanded for a new trial as discussed in sections II and III of the majority opinion. However, I do not agree that the trial court erred by admitting the deposition of Lance Sinka and I respectfully dissent to section I of the majority opinion.

The majority holds that Lance's deposition should not have been admitted because he was not, as a matter of law, competent to testify. To reach this result, the majority reviews de novo the decision to admit the testimony, substitutes its own judgment for that of the trial court, and confuses admissibility with credibility. I disagree with both

the standard of review applied and the analysis of competency.

The determination of the competency of a child witness is within the discretion of a trial judge and should not be overturned absent a manifest abuse of discretion. *Laudermilk v. Carpenter,* 78 Wn.2d 92, 102, 457 P.2d 1004, 469 P.2d 547 (1969). In its opinion, the majority states, without citation of authority, that when the trial court makes its determination of competency on documentary evidence, this court may review de novo the trial court's finding. While I agree that the trial court's opportunity to view a child's demeanor is an important reason for leaving this determination to the discretion of the trial court, there are other equally compelling reasons for deferring to the trial court on the issue of competency.

The basis of the appellate courts' policy of deferring to trial courts' discretion stems from the basic structure of the judicial process. The primary function of an appellate court is to provide guidance on legal issues. The primary function of a trial court is to apply those legal guidelines to particular factual situations. Determination of competency is often a close factual question on which two reasonable fact finders may disagree. Absent an abuse of discretion, I see no reason for usurping the trial court's function as a fact finder and reversing its decision merely because we would have reached a different result. This encourages the appeal of close factual questions, thereby undermining both the authority of the trial court and the proper role of appellate courts.

More importantly, I agree with the trial court's finding that Lance was competent to testify. Lance's testimony at the deposition clearly demonstrates that he met the five criteria for competency set out in *State v. Allen,* 70 Wn.2d 690, 692, 424 P.2d 1021 (1967), which interpreted RCW 5.60.050.[2] Lance's deposition testimony indicates that he is

---

[2]RCW 5.60.050 provides in part:

"The following persons shall not be competent to testify:

aware of his surroundings and can answer questions intelligently. At the beginning of the deposition he testified:

Q Let me ask you some questions, Lance. Tell me your name?
A Lance.
Q What is your last name?
A Sinka.
Q How old are you, Lance?
A Seven.
Q Do you go to school?
A Yep.
Q Where?
A Chelan, right by the high schools.
Q What grade are you in?
A First.
Q What is the name of your teacher?
A Mrs. Pusey.
MRS. HOLMAN: P–u–s–e–y.
A My brother calls here [*sic*] Mrs. Pewey (ph. sp.).
Q (By Mr. Baker) I bet you don't call here [*sic*] Mrs. Pewey, do you?
A No. I'd go to the principal.

His understanding of the obligation to speak the truth is also apparent from his deposition:

Q Lance, let me ask you a couple of other questions. It's important that you tell me the truth when I ask you a question.
A Okay.
Q Because a lot of people are concerned about what happened, and we want to know exactly what happened—
A That's the truth.
Q —as best you can recall. You understand what it means to tell the truth, don't you?
A Mm–hmm. I never lie.
Q You never lie?
A Only when I was four years old, three years old, or two years old, or one year old. That's the only time I lied.

---

". . .

"(2) Children under ten years of age, who appear incapable of receiving just impressions of the facts, respecting which they are examined, or of relating them truly."

Q When you were really little?
A Mm–hmm.
Q In the questions that you have been answering for me just now, the things you have just told me, were they the truth?
A Yep.
Q All of it?
A Mm–hmm.

And later in the deposition:

Q (By Mr. Baker) Lance, when I started to talk to you, do you remember promising me to tell the truth?
A Yes.
Q Did you know what that meant?
A Yes.

CROSS EXAMINATION (Continuing)

BY MR. GREIVE:
Q What did it mean?
A It means if you lie you would get in bad trouble.

He demonstrated his ability to receive an accurate impression of the accident at the time it occurred, to express his memory of it in words and to understand simple questions about it:

Q Do you remember when you and Jonathan went over to the substation?
A Yep.
Q And went inside of the substation?
A No.
Q No what? You didn't go inside the substation?
A No. He just went in there. When it shocked him, I went in there.
Q You went in after he was shocked?
A Yep.
Q Where were you when he got shocked?
A Outside the fence.
Q Why didn't you go in?
A I knew it was a power plant.
Q You knew it was a power plant?
A (The witness nods.)
Q How did Jonathan get inside there?
A Climbed over the fence, and there wasn't no barbed wire like over—around the fence they usually have barbed wire on it, and that only half of the size only

has barbed wire on it.

Q The part that he climbed over didn't have any barbed wire?

A Mm–hmm.

Q Could you see that there was barbed wire other places around it?

A Yes, because we ride our bikes around there in the mud.

Q On that day or other days?

A Other days, all kinds of days.

Q Had Jonathan ever climbed over there before that you know of?

A No.

The majority finds Lance to be incompetent on the grounds that his memory is not "sufficient to retain an independent recollection of the occurrence", the third criteria established in *State v. Allen, supra* at 692. In reaching this conclusion, the majority relies on what it characterizes as inconsistencies in his testimony concerning his understanding, prior to the accident, of the dangers of electricity. The testimony which the majority finds inconsistent is, at best, vague. It is, however, clear from the entire deposition that Lance knew the substation was dangerous. What is unclear is when he learned about "electricity". If this is an inconsistency in his testimony, it is a minor and highly technical one, which would be relevant only to the credibility of his testimony, to be determined by the jury, not to his competency to testify, a judicial decision. *State v. Woodward,* 32 Wn. App. 204, 207–08, 646 P.2d 135 (1982).

The requirement that a child have the ability to retain an independent recollection of an occurrence does not require that a child's testimony be consistent in all aspects. Children, as well as adults, often testify inconsistently. This affects their credibility, not their competence. *Woodward,* at 207–08. In this case, Lance obviously had an independent recollection of the accident and of how the substation looked to him:

Q How did you know about it?

A Because I heard, seen it, heard the electricity, plus I

seen the little things going around and around. There's kind of like fans?

Q Before you went in there, before you went into the substation itself, could you hear any noise at all?

A A little bit.

Q What did it sound like?

A Like a snake.

Q That's very good. Could you hear that noise before Jonathan went into the substation?

A Yep.

Q After Jonathan went into the substation?

A Then he climbed up on there and I told him to get down, and he didn't hear me. I yelled louder, and he didn't just pay attention. He didn't pay attention.

As referred to above, he even corrected the examining attorney when a question made it appear as if the attorney were confused as to the order of events:

Q Do you remember when you and Jonathan went over to the substation?

A Yep.

Q And went inside of the substation?

A No.

Q No what? You didn't go inside the substation?

A No. He just went in there. When it shocked him, I went in there.

Q You went in after he was shocked?

A Yep.

This testimony demonstrates that Lance had an independent recollection of the accident. I am satisfied that this is sufficient to establish his competency. The credibility of his testimony is for the jury to determine.

Finally, I am concerned about the impact of this decision on the many other cases, such as those involving child abuse, in which a child is an important and sometimes sole witness. By substituting its own judgment as to competency, and then by confusing that issue with credibility, the majority may have unintentionally set a higher standard for admission of children's testimony than can realistically be met.

I would affirm the trial court's finding that Lance was

competent to testify. In all other respects I concur with the majority.

ANDERSEN, J., and HAMILTON, J. Pro Tem., concur with DURHAM, J.