39 P.3d 993 (2002)
110 Wash.App. 233
M.W. and A.W., husband and wife, and the marital community; and M.W. and A.W., as guardians and parents of the minor child, J.C.W. f/k/a S.K.H., Appellants,
v.
DEPARTMENT OF SOCIAL AND HEALTH SERVICES, a division of the State of Washington; and State of Washington; and Dale Francis, an individual, Respondents.
No. 26377-7-II.
Court of Appeals of Washington, Division 2.
February 8, 2002.
Reconsideration Denied March 27, 2002.
John Cain, Tacoma, Ross Edwin Taylor, University Pl, for Appellants.
Peter John Helmberger, Attorney General Office, Olympia, for Respondents.
*994 ARMSTRONG, C.J.
J.C.W., through her guardian, sued the Department of Social and Health Services (DSHS), alleging that several employees were negligent in examining her for sexual abuse. DSHS argued that it has a statutory duty to investigate allegations of child abuse and that its examination was reasonable. The trial court granted DSHS's motion for summary judgment. J.C.W. appeals, contending that there remains a genuine issue of material fact as to whether DSHS's investigation was reasonable. We agree and, therefore, reverse and remand for trial.

FACTS
In March 1996, J.C.W. lived with her foster parents, M.W. and A.W.[1] On March 18, 1996, when J.C.W. was 16 months old, her biological father, S.H., reported to DSHS that J.C.W. was being sexually abused. S.H. complained to Dale Francis, a DSHS supervisor,[2] that J.C.W. often had vaginal redness, exhibited antisocial behavior, and was clingy. S.H. also showed Francis pictures of J.C.W. taken by M.W. and A.W. S.H. claimed that the pictures, which showed J.C.W. in the bathtub, were pornographic.[3] The same day, when A.W. was at the DSHS office with J.C.W., Francis asked two female DSHS workers to see if J.C.W. had vaginal redness.
A.W. took J.C.W. into the DSHS conference room. "Home support specialists" Insu Baker and Lila Stinson came into the conference room; program manager Kenneth Panitz, social worker Mat Reitzug, and Francis remained in the doorway. Baker and Stinson asked A.W. to remove J.C.W.'s diaper. They then examined J.C.W.'s genitals and "pulled apart [J.C.W.'s] vaginal area to see if there was vaginal redness." CP at 76. A.W. stated in her deposition:
The first thing is [Stinson and Baker] were kind of looking at [J.C.W.]. "Geez, do you see redness?" One would say yes; one would say no. And then they started pointing and touching the outside. And I would say it was probablyit was both of them. I think one did it first and then the other one, and they were kind of bantering back and forth.
. . . .
And then that's when they went in and stuck their hands in and pulled apart like this.
. . . .
... [T]here was [sic] two types of touching. One was the actual poking of the outer area. Not her legs, but her private areas.
. . . .
The other was sticking their hands inside of her and pulling her apart like so.
CP at 227-29. A.W. compared the women's actions to pulling apart and inserting one's hands inside the opening of a Kleenex tissue box. A.W. estimated that the touching and poking lasted four to five minutes. J.C.W. began to cry during the examination. A.W. also cried.
Another DSHS employee entered the conference room, concluded there was no vaginal redness, and told Baker and Stinson to "cover that baby up." CP at 76. A.W., Baker, and Stinson then took J.C.W. to Mary Bridge Hospital where a doctor examined her for sexual abuse. The doctor found no signs of abuse. Following an investigation, DSHS concluded that the allegations were unfounded and cleared M.W. and A.W. of wrongdoing. J.C.W.'s counselor submitted a declaration stating that J.C.W. suffered from post-traumatic stress disorder because of the examination.

ANALYSIS

I. Standard of Review
When reviewing an order of summary judgment, we engage in the same inquiry as the trial court. Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 (1982).
*995 Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. CR 66(c). We consider all facts and reasonable inferences from them in the light most favorable to the nonmoving party. Wilson, 98 Wash.2d at 437, 656 P.2d 1030.

II. Negligent Investigation
A. Claim Against DSHS
Both parties describe this as a claim for negligent investigation of suspected child abuse, a recognized cause of action in Washington. Tyner v. DSHS, 141 Wash.2d 68, 79-81, 1 P.3d 1148 (2000). RCW 26.44.050 requires DSHS to investigate allegations of child abuse.[4] Under this statute, DSHS owes a duty of care to both the child victim and the child's parents when investigating allegations of child abuse. Tyner, 141 Wash.2d at 81-82, 1 P.3d 1148. In most negligent investigation claims, the allegations are that DSHS failed to adequately investigate a living situation either before removing or placing a child in the situation.[5] This claim is different. J.C.W does not contend that DSHS failed to investigate the alleged sexual abuse. Rather, she alleges that as part of the investigation, several DSHS employees negligently conducted a physical examination of her.
DSHS argues that because RCW 26.44.050 requires it to investigate child abuse allegations, it was simply fulfilling its statutory duties when it examined J.C.W.,[6] Washington law requires DSHS to respond to abuse allegations immediately and permits DSHS to photograph children to document abuse; thus, says DSHS, the examination of J.C.W. was permissible. In fact, DSHS characterizes its investigation of J.C.W. as "overly cautious" and argues that DSHS's having done "too much" does not support a negligent investigation claim. Br. of Resp. at 14. According to this reasoning, DSHS can be liable for negligent investigation only when it fails to investigate, not when it investigates unreasonably. This argument is unpersuasive. Implicit in the duty to investigate under RCW 26.44.050 is the duty to investigate reasonably.
In Lesley v. DSHS, 83 Wash.App. 263, 921 P.2d 1066 (1996), parents sued DSHS and a caseworker for negligent investigation of child abuse. The Lesleys' daughter, Taylor, had Mongolian spotsa type of birthmark common in African-American childrenon her lower back and buttocks. A daycare worker saw the marks and, believing they might be bruises, contacted Child Protective Services (CPS). Lesley, 83 Wash.App. at 266-67, 921 P.2d 1066. CPS immediately removed Taylor from her parents' custody without personal notification. Lesley, 83 Wash.App. at 267, 921 P.2d 1066. CPS caseworkers ignored or downplayed the parents' repeated assertions that the marks were Mongolian spots. Finally, six days after removing Taylor from her parents' custody, a doctor identified the marks as Mongolian spots and diagnosed Taylor's vaginal rash as a yeast infection. CPS returned Taylor to her parents. Lesley, 83 Wash.App. at 271, 921 P.2d 1066.
The Court of Appeals reversed summary judgment in favor of DSHS, holding that DSHS could be liable for negligently investigating the marks. Lesley, 83 Wash. App. at 273, 921 P.2d 1066. For the caseworkers *996 to have qualified immunity against such a claim, they must "(1) carry out a statutory duty, (2) according to procedures dictated by statute or superiors, and (3) act reasonably." Lesley, 83 Wash.App. at 274, 921 P.2d 1066. The Lesleys had presented evidence that the caseworker failed to follow proper procedures and may not have acted reasonably under the circumstances. Lesley, 83 Wash.App. at 275, 921 P.2d 1066.
DSHS argues that its liability in Lesley arose from a failure to act, that is, its failure to investigate whether the marks were Mongolian spots or bruises. But the Lesleys' complaint was not that DSHS failed to investigate child abuse; it was that DSHS's overzealous investigation was unreasonable and procedurally improper. In Lesley, the essence of the claim was that DSHS did "too much." J.C.W. makes the same claim. And Lesley held that the duty to investigate child abuse includes a duty to act reasonably.
Other negligent investigation cases have also recognized that DSHS's duty to investigate necessarily involves the duty to act reasonably. See Tyner, 141 Wash.2d at 79, 1 P.3d 1148 ("During its investigation the State has the duty to act reasonably in relation to all members of the family."); Yonker v. Dep't of Soc. & Health Servs., 85 Wash.App. 71, 77, 930 P.2d 958 (1997) (summarizing negligent investigation case law as requiring "the State [to] act responsibly once it decides to act"); Dunning v. Paccerelli, 63 Wash.App. 232, 240, 818 P.2d 34 (1991) ("[T]he [child abuse] reporting statute is framed in terms of reasonableness.").
Here, the trial court concluded that "[t]here is no genuine issue of material fact insofar as Plaintiff failed to establish that DSHS breached a duty owed to J.C.W." CP at 473. This was error. M.W. and A.W. submitted evidence that DSHS breached its duty to investigate reasonably: Francis, who received S.H.'s complaint, "had some female staff members ... respond to [the] allegation." CP at 98. Social worker Reitzug testified that he asked Panitz to have home support specialists take a "look-see" to determine if J.C.W. had vaginal redness. A.W. testified in her depositions that the two home support specialists "touched," "poked," and "pulled apart" J.C.W.'s genital area. Panitz stated in his deposition that home support specialists are not trained to give physical examinations and that giving physical exams is not part of their job.[7] He also stated that, as their supervisor, he would not have authorized them to conduct a physical exam to determine child abuse. Home support specialist Baker denied performing the exam and denied being in the conference room with J.C.W. But she admitted that she had no training in performing physical examinations of children to determine physical or sexual abuse. Stinson, the other home support specialist, similarly denied performing the exam and admitted that she was not qualified to perform such an exam in any event.
J.C.W. also submitted affidavits from several experts. Certified counselor Leslie Chertok stated that the inspection was intrusive and that J.C.W. was not properly prepared for the inspection in a way that would minimize trauma. Teri Hastings, a clinical psychologist specializing in child psychology, stated that the DSHS investigation was problematic for several reasons: (1) failing to adequately prepare J.C.W. for such an intrusive examination, (2) allowing unskilled, untrained DSHS workers to conduct the examination, *997 and (3) performing the examination in the presence of the alleged abuser (A.W.). Laura Odegard-Davis, a former caseworker for the Children's Home Society, stated that a physical examination at the DSHS office, conducted by untrained workers, was unethical, unprofessional, and traumatic for J.C.W. Finally, Linda Thomas-Jones, a DSHS caseworker who knew J.C.W., A.W., and M.W., testified in her deposition that the DSHS policy was to "refer potential victims to the sexual assault clinic to have an examination and interview and evaluation," not to have a caseworker do the exam and investigation. CP at 363.
DSHS countered with evidence that the examination was proper and reasonable.[8] But at most this raises a question of fact. Generally, whether a party acts reasonably is a question of fact and summary judgment is inappropriate if reasonableness is a material issue in litigation. See Morris v. McNicol, 83 Wash.2d 491, 495, 519 P.2d 7 (1974). Taking the evidence in the light most favorable to J.C.W., a jury could find that the decision to examine J.C.W. was unreasonable or unauthorized, that Baker and Stinson were unqualified to perform a child sexual abuse exam, that they exceeded the scope of what they were asked to do, and that the manner of examining J.C.W. was unreasonable. Summary judgment was inappropriate.
B. Claim Against Dale Francis
The trial court found as a matter of law that "[t]here is no genuine issue of material fact insofar as Dale Francis did not act in an unreasonable manner or fail to follow the direction of supervisors and therefore is immune from the cause of action of negligent investigation." CP at 473. But Dale Francis is immune from negligent investigation charges only if he was carrying out a statutory duty, according to procedure dictated by statute or superiors, and acting reasonably.[9]Lesley, 83 Wash.App. at 274, 921 P.2d 1066. J.C.W. submitted evidence that Francis decided to have workers examine J.C.W.,[10] that this decision was unreasonable, and that the examination was conducted in an unreasonable manner. Thus, the fact finder must decide whether Francis acted reasonably; summary judgment on the issue of his liability was inappropriate.
We address the argument of the dissent. The dissent reasons that because J.C.W. does not claim that DSHS either negligently placed or removed her from a living situation, her claim is not the typical negligent investigation claim. We agree. The dissent then renames the claim a "tortious assault" and states the issue as "whether the touching was tortious or privileged." Whatever labels are applied, we agree that the critical question centers on the DSHS employees' physical examination of J.C.W.
The dissent finds the examination privileged because DSHS stands in the role of parent to J.C.W. and a reasonable parent would surely remove the child's diaper and look for redness if he or she thought the child had been sexually abused. Dissent at 1004-05. In reaching this conclusion, the dissent misstates the facts. J.C.W. does not claim that the DSHS employees only removed a diaper and looked for redness. Rather, she presented evidence that the employees poked, prodded, and pulled her apart *998 while physically examining her, an examination they were not qualified to perform.
Moreover, DSHS does not claim that its conduct was privileged. Rather, it concedes that it owed J.C.W. a duty to investigate the possible abuse in a reasonable manner. DSHS argues only that it did not breach this duty. As we have discussed, J.C.W. presented evidence sufficient to create an issue of material fact on the reasonableness of the examination. Nevertheless, we consider whether DSHS was privileged to harm J.C.W. during the physical examination.
Washington recognizes a limited parental immunity doctrine. Jenkins v. Snohomish County, 105 Wash.2d 99, 104, 713 P.2d 79 (1986). This includes immunity for negligent supervision. Jenkins, 105 Wash.2d at 104, 713 P.2d 79. The doctrine is based upon the public policy of "maintaining family tranquility, fear of undermining parental control and authority, an interest in assuring that family property be shared by all rather than appropriated by one family member, fear of collusion and fraud[.]" Jenkins, 105 Wash.2d at 104, 713 P.2d 79. These public policy considerations do not exist for employees of DSHS. Understandably, no case has held that DSHS enjoys a parent's immunity.
But the dissent cites the Restatement (Second) of Torts, section 147(2) (1965). This section appears under the heading, "Privilege to Discipline Children," and grants a parent the privilege to use reasonable force for "its [the child's] proper control, training, or education." The section also affords the privilege to one other than a parent who has the function of controlling, training, or educating the child. But again the force must be reasonable and must be necessary to the "proper control, training, or education" of the child. RESTATEMENT (SECOND) OF TORTS, § 147(2) (1965). No Washington case has adopted section 147(2). According to comment (f), the section protects a guardian of the child's person, officers of a state orphanage or reformatory, and others. RESTATEMENT, § 147(2) cmt. f. The categories are linked in protecting only those who have physical custody or control of the child victim, as a parent does. The DSHS employees who examined J.S.W. do not fit within any of the categories. Moreover, they were not using force to control, train, or educate J.C.W.; they were attempting to perform a physical examination. And even if the section applies, the force must be reasonable. Comment (d) explains that "the parent's privilege of discipline is necessarily more extensive than that of other persons stated in Subsection (2)" and that this "must be taken into account in determining what is reasonable[.]" RESTATEMENT, § 147(2) cmt. d. That is the very question the parties dispute. Section 147 does not apply to the DSHS employees' examination of J.C.W. and, even if it did, the question would still be whether the employees acted reasonably in physically examining J.C.W.
We conclude that J.C.W. presented sufficient evidence to withstand summary judgment; a jury must resolve the issues of material fact to determine whether DSHS negligently examined her.
Reversed.
I concur: SEINFELD, J.
MORGAN, J. (dissenting).
In March 1996, DSHS had custody of a sixteen-month-old girl. It had placed the girl in a foster home, pending termination of the natural parents' rights. The foster parents were caring for the girl, but the natural parents still had visitation.
On March 18, 1996, the girl's natural father filed a written complaint with DSHS. He alleged that the girl "is often red in the genital area," is "exhibit[ing] antisocial behavior," and is "clingy."[11] He further alleged that the foster mother had taken "pornographic photos" of the girl.[12] Essentially, he claimed or implied that the girl was being sexually abused in the foster home.
That same day, the foster mother brought the girl to the DSHS office. There, two female DSHS employees called "home support *999 specialists"[13] removed the girl's diaper and examined her genitalia for signs of abuse. The foster mother was present and watching. In her deposition, which states the facts in the light most favorable to her and the other plaintiffs,[14] she described her observations as follows:
Q: ... [W]as [it the two home support specialists] that did this physical examination?
A: It was them.
Q: Did they penetrate the [child's] vaginal area?
A: No.
Q: And just so I'm clear, you removed the diapers?
A: Yes.
Q: Was there redness in the vaginal area?
A: No.
Q: Any diaper rash?
A: No.
Q: ... Did they leave any marks?
A: I don't believe so.
Q: Do you recall if there was any bruising?
A: No.
Q: Leave any redness?
A: I don't believe they left any redness, because they didn't find any on her when we got to [the hospital].[15]
Later, the foster mother elaborated as follows:
Q: How did [the examination] start?
A: The first thing is they were kind of looking at her. "Geez, do you see redness?" One would say yes; one would say no. And then they started pointing and touching the outside. And I would say it was probablyit was both of them. I think one did it first and then the other one, and they were kind of bantering back and forth.
Q: What was the tone of their voice? Were they talking in a normal voice, were they whispering?
A: They weren't whispering. They were normal voice.
Q: Okay.
A: ... And they weren't being rough with her. By any stretch of the imagination, they weren't. I mean, I think I probably would have gone ballistic had that happened.
And then that's when they went in and stuck their hands in and pulled apart like this.
. . . .
Q: ... [Y]ou used your index finger and you essentially poked it in the air to describe poking a child? Can you for the record describe that a little bit?
A: Sure. To me there was two types of touching. One was the actual poking of the outer area. Not her legs, but her private areas.
Q: They didn't touch the inner thigh when they were poking?
A: No.
Q: Okay. Were they poking the labia then?
A: Yes. I don't know all the technical terms for a woman's body parts. I probably should, but I don't.
The other was sticking their hands inside of her and pulling her apart like so.[16]
And later, the foster mother again elaborated:
Q: How far into the vaginal opening did [the home support specialist] go?
A: She didn't stick her fingers up inside of her, I can tell you that.
. . . .
Q: Was the vaginal canal penetrated by anybody who's touching that child?

*1000 A: I can't say yes or no, because I wasn't quite down there looking at their fingers to say how far in that they went.[17]
Ultimately, DSHS employees took the child to a hospital emergency room, where the examining physician found nothing remarkable.
After March 18, 1996, the natural parents' rights were terminated, and the foster parents were permitted to adopt the little girl.
After adopting the little girl, the foster/adoptive parents, acting as individuals and the girl's guardians, sued DSHS for the March 18th examination of the little girl's genitalia.[18] The foster mother asserted claims for negligent infliction of emotional distress, outrage, and invasion of privacy. The foster father asserted a claim for invasion of privacy. The little girl asserted claims for outrage, invasion of privacy, violation of civil rights, and "negligent investigation." The trial court granted DSHS' motion for summary judgment on all claims.
On appeal, the foster/adoptive parents do not contest the dismissal of most of their claims. According to their brief, the "sole issue" they now place before this court is "the trial court's decision ... on the claim of negligent investigation."[19]
The Washington courts generally do not recognize a cause of action for "negligent investigation." Thus, a person charged with a crime may not sue the police, even after he has been acquitted or dismissed, for negligently investigating his conduct;[20] a person suspected of a crime may not sue the police, even after another person has been charged and convicted, for negligently questioning him;[21] a person victimized by domestic violence may not sue the police for negligently failing to investigate her complaint;[22] a child care worker suspected of child abuse may not sue DSHS for negligently investigating her conduct;[23] a teacher fired for possessing sexually explicit drawings may not sue the school-district/employer for negligently investigating his conduct;[24] an employee fired after a sexual harassment complaint may not sue the employer for negligently investigating the complaint;[25] and a real estate developer may not sue the State Department of Fish and Wildlife for negligently investigating the sight of an eagle nest.[26]
Although the Washington courts generally do not recognize a cause of action for "negligent investigation," they do recognize "a limited exception in the area of child abuse investigations."[27] Under this limited exception, a parent or child,[28] but not a child care worker,[29] may sue DSHS and its employees,[30] or a law enforcement agency and its employees,[31] for negligently placing the child *1001 in a foster home in which the child is later abused;[32] for failing to remove the child from a foster or parental home in which the child is later abused;[33] and for negligently removing the child from a parental home in which the child properly belongs.[34] Because the scope of this exception remains unclear, I begin by examining the twelve published cases that touch on it. The Supreme Court has decided two; Division One eight; Division Two one; and Division Three one.
The first case, Babcock v. State,[35] was decided by the Supreme Court in 1991. According to the plaintiffs' allegations, DSHS negligently placed several young girls in foster care with a man whose "criminal record... included charges of forcible rape, sexual assault, and attempted rape."[36] When the man sexually abused the girls, they and their father sued DSHS for what the Supreme Court characterized as "negligent foster care investigation and placement,"[37] "negligent foster care placement,"[38] or "negligent investigation."[39] The court decided that none of the defendants were absolutely immune, but that some of the defendants were qualifiedly immune. In doing that, according to a later case, the court "implicitly approved a negligent investigation claim."[40] The Babcock court remanded for trial.
The next case, Dunning v. Paccerelli,[41] should have been characterized as an action for defamation rather than an action for "negligent investigation." It arose when DSHS placed three child care workers on a list of persons who had not reported child abuse in the manner required by law. Alleging that DSHS had negligently put them on the list, the three workers sued. The trial court dismissed on summary judgment, but Division Three reversed. Division Three held that the defendants were not shielded by absolute immunity, collateral estoppel, or the public duty doctrine. Dunning may now be moot due to Pettis v. State,[42] a Division One case discussed below.[43]
The next case, Waller v. State,[44] was decided by Division One in 1992. It arose from a custody battle between parents. An ex-wife complained to DSHS that her ex-husband was sexually abusing their two young children. According to the ex-husband's later allegations, DSHS allegedly failed to properly investigate the ex-wife's complaint, causing a child-custody court to eliminate the ex-husband's visitation rights for more than two years. When he regained custody, he sued DSHS for negligently depriving him of visitation with his children.[45] Reversing the trial court's dismissal on summary judgment, Division One ruled that an issue of fact existed on whether DSHS's "allegedly negligent investigation was a proximate cause of [his] being deprived of visitation."[46] Division One also ruled that the defendants were not absolutely immune.
The next case, Lesley v. DSHS,[47] was decided by Division One in 1996. It began when daycare workers notified DSHS that they had observed marks on an eleven-month-old girl. A caseworker and police took the girl into protective custody, where *1002 she remained for six days. During those six days, the caseworker engaged in an allegedly biased and incomplete investigation of whether the parents had physically abused the girl. Finally, a medical specialist determined that the marks were normal birthmarks, and the girl was returned to her parents. The parents sued DSHS, but the trial court dismissed on summary judgment. Reversing, Division One held that Washington recognizes "a cause of action for negligent investigation."[48] It also held that the defendants were not immune.
The next case, Yonker v. DSHS,[49] was decided by Division One in 1997. It involved an ex-wife and ex-husband who had joint custody of their two-year-old son. The ex-husband had prior convictions for indecent liberties and trespass involving peeping. On two occasions, the ex-wife complained to DSHS that she suspected child abuse, but DSHS took no action. Soon after the second complaint, the ex-husband confessed to sexually abusing his son. The ex-wife sued DSHS, but the trial court dismissed on summary judgment. Reversing, Division One held "that Washington recognizes a cause of action for negligent investigation of possible child abuse,"[50] and that DSHS could not shield itself behind the public duty doctrine.
The next case, Gilliam v. DSHS,[51] was decided by Division One in 1998. It began when an ex-wife told DSHS that her children had told her they were being abused by her ex-husband. A DSHS caseworker conducted an investigation that allegedly was one-sided and incomplete. She also filed a dependency petition that resulted in a stipulation and order suspending the ex-husband's visitation. Several years later, the ex-husband was awarded physical custody of the children and the dependency petition was dismissed. In the meantime, the ex-husband had sued DSHS, "claiming the caseworker's inadequate investigation of the allegations inordinately prolonged the dependency proceedings and his separation from his children, resulting in mental anguish and expenses."[52] The case went to trial, but the trial court dismissed on immunity grounds at the end of the plaintiff's case in chief. Reversing, Division One held that "the conduct complained of was ... insufficiently tied to the judicial process to warrant a grant of absolute immunity."[53]
The next case, In re Estate of Shinaul M.,[54] was decided by Division One in 1999. It involved a severely disabled child whose guardians placed him in a group home, partly on DSHS's recommendation. The child died in the home while being physically restrained. His natural mother sued DSHS, alleging that DSHS had negligently investigated and recommended the group home. The trial court dismissed on summary judgment, but Division One reversed. "Address[ing] only the issue of legal causation,"[55] Division One concluded that DSHS should "not be absolved of liability for resulting foreseeable injuries where a DSHS employee breaches its duty to a developmentally disabled child and the breach of duty is a `but for' cause of the injury;" thus, "if the [child's] Estate can establish that [DSHS' employee] gave materially misleading information that caused [the child] to be placed at [the group home] inappropriately," a rational trier of fact could return a verdict for plaintiff.[56]
The next case, Beltran v. DSHS,[57] was also decided by Division One in 1999. DSHS placed three young children in a foster home, where they were assaulted by the foster mother's teenage son. The natural mother *1003 sued the foster mother for negligent supervision of her teenage son. She also sued DSHS "for negligence and civil rights violations."[58] The foster mother moved for summary judgment on the ground that she "could be liable only for the intentional torts of her son if she knew or should have known of the dangerous proclivities of her son, and then failed to take reasonable steps to control those proclivities (i.e., by supervising her son and his interaction with the foster children)."[59] DSHS also moved for summary judgment. The trial court granted both motions, and the natural mother appealed only the dismissal of DSHS. Stating that "only the proximate cause element of the claim is at issue in this appeal,"[60] Division One concluded that even if DSHS had negligently placed the children in the foster home, its negligence could not have been a proximate cause if, as had been finally determined in the trial court, the foster mother had not been negligent in supervising her son.
The next case, Pettis v. State,[61] was also decided by Division One in 1999. A school district employed a child care worker whom DSHS inconclusively investigated for child abuse. The district moved the worker to a different job because of the investigation. The worker sued for "negligent investigation," but the trial court dismissed on summary judgment. Affirming, Division One held that DSHS did not owe a duty of care to a child care worker.
The next case, Rodriguez v. Perez,[62] was decided by Division One in 2000. Several plaintiffs sued law enforcement agencies and personnel for "negligent investigation" that resulted in the removal of children from their homes. The trial court dismissed for failure to state a claim, but Division One reversed. Division One held that a parent or child could bring a "negligent investigation" action against law enforcement as well as against DSHS.
The next case, Tyner v. DSHS,[63] was decided by the Supreme Court in 2000. In January 1993, a wife complained to DSHS that she suspected her husband of abusing their two children. A DSHS caseworker conducted an incomplete investigation and filed a dependency petition, causing the juvenile court to prohibit contact between the husband and his children. Ten days later, the caseworker concluded that the wife's suspicions were unfoundedbut he neglected to tell anyone about his conclusion. In June 1993, the juvenile court dismissed the dependency petition on DSHS's motion. In October 1993, a dissolution court lifted all restrictions on the husband's visitation. In February 1995, the husband sued DSHS for "negligent investigation," the case went to trial, and the jury awarded the plaintiffs $201,500. DSHS appealed to the Supreme Court,[64] which held that DSHS owes to a child and a child's parents "a statutorily mandated duty to investigate child abuse allegations."[65] The Supreme Court also held that "the conduct of a CPS caseworker may, in some circumstances, be the legal cause of a parent's separation from a child, even when the separation is imposed by court order."[66] Based on these holdings, the court affirmed the verdict.
The most recent case, Miles v. Child Protective Services,[67] was decided by Division Two in 2000. DSHS received a complaint that three children might be in danger because their mother suffered from a condition known as Munchausen's Syndrome by Proxy. DSHS removed the three children from the mother's home and had them examined at a hospital. Based on the findings of 26 medical *1004 and other personnel, the trial court prohibited unsupervised contact between the mother and children for about seven months. After the children had been returned to the mother's home, the mother sued DSHS for "negligent investigation." The trial court dismissed on summary judgment, and we affirmed. We held that a rational trier of fact could not find factual causation, and that the caseworker was qualifiedly immune under RCW 26.44.056(3).
These 12 cases can be grouped into three categories. In one, exemplified by Babcock, Shinaul and Beltran, DSHS is liable for negligently placing a child in a foster home,[68] if the negligence is a proximate cause of subsequent abuse.[69] In another, exemplified only by Yonker, DSHS is liable for negligently failing to remove a child from the home of a parent who has custody or visitation, if the negligence is a proximate cause of subsequent abuse.[70] In a third, exemplified by Tyner, Lesley, Gilliam, Rodriguez, Miles, and Waller, DSHS is liable for negligently removing a child from the home of an innocent, non-abusive parent who has custody or visitation, if the negligence is a proximate cause of harm to the parent-child relationship.
Each of these categories shows that before DSHS makes a child-placement decisionin other words, before it decides to place a child in a home, leave a child in a home, or remove a child from a homeit must assemble and consider as much information as a reasonable person would assemble and consider under the same or similar circumstances. If it fails to do that, and its failure is a proximate cause of harm to the child or parents, it is liable for "negligent investigation."
None of these categories even suggest that if DSHS engages in intentional or negligent misconduct in the course of assembling information, it will be liable to a greater degree than the ordinary citizen. Suppose, for example, that a DSHS worker is investigating a complaint of child abuse. He drives to the child's home to interview the parents. While turning into the driveway, he negligently runs over the child. He is liable in the same way as any other citizen, and DSHS is subject to respondeat superior in the same way as any other citizen. But is either liable for "negligent investigation?" I think not, as the liability imposed on DSHS should not be greater than, or even different from, the liability imposed on any other citizen.
In light of the foregoing, the decision here should rest on two propositions. First, the ill-defined tort of "negligent investigation" requires proof that DSHS based a child-placement decision (i.e., a decision to place, leave, or remove a child from a home) on a body of information that was unreasonably incomplete or skewed. Second, the ill-defined tort of "negligent investigation" has nothing to do with DSHS' activities while accumulating a body of information, regardless of whether that information turns out to be incomplete or skewed. To prove that DSHS is liable for its activities while accumulating information, a claimant must prove the elements of some other, recognized tort (for example, negligent operation of a car, negligent infliction of emotional distress, outrage, or assault).
Even when viewed in the light most favorable to the claimants, the record in this case does not support a finding that DSHS based a child-placement decision on information that was unreasonably incomplete or skewed. It is undisputed that DSHS properly placed *1005 the girl in the foster home. It is undisputed that DSHS did not remove the girl from that home. It is undisputed that when DSHS decided to leave the girl in the foster home despite the natural father's allegation of abuse, it did so on the basis of information that was complete and accurate. The record does not support a claim of "negligent investigation," and the trial court did not err by granting summary judgment on that claim.
The record suggests the possibility of two other torts. One is negligent infliction of mental distress. The other is assault.
The plaintiffs may not assert a claim for negligent infliction at this point in this litigation. The mother asserted such a claim in the trial court but has abandoned it on appeal. The little girl asserted a claim for "outrage" in the trial court but has abandoned it on appeal. The little girl did not assert a claim for negligent infliction in the trial court, and she may not do so for the first time on appeal.[71] We should not disturb the trial court's dismissal of claims that were made but not appealed, nor should we disturb the trial court's disregard of claims that were not made.
The record does not support a claim for assault. Taking the evidence in the light most favorable to plaintiffs, two of DSHS' in-home helpers touched a little girl's genitalia to see if they could discern signs of sexual abuse. The only remaining issue is whether the touching was tortious or privileged. The touching was clearly privileged because, as legal custodian of the child, DSHS had the right to check out the natural father's allegation of child sexual abuse, just as any parent would have done; and any parent in his or her right mind would have responded to a complaint of child sexual abuse by removing the child's diaper and checking her genitalia.[72] Nothing actionable occurred here, and the trial court correctly dismissed the complaint.[73]
The majority concedes that no Washington case applies the tort of "negligent investigation" in a situation of this type. It states:
In most negligent investigation claims, the allegations are that DSHS failed to adequately investigate a living situation either before removing or placing a child in the situation. This claim is different. [The little girl] does not contend that DSHS failed to investigate the alleged sexual abuse. Rather, she alleges that as part of the investigation, several DSHS employees negligently conducted a physical examination of her.[74]
The majority fails, however, to analyze or even address why Washington's "limited exception" for "negligent investigation" should be extended from situations in which DSHS bases a child-placement decision on a body of information that is inadequate or skewed, to situations in which DSHS engages in negligent or intentional misconduct while assembling a body of information that is neither incomplete nor skewed. Because of this failure, *1006 the majority potentially expands DSHS' liability to an extent that is both unsupported and unwise. Thus, I respectfully dissent.
NOTES
[1] M.W. and A.W. have now adopted J.C.W.
[2] The record does not reflect Francis's exact title or position at DSHS.
[3] M.W. and A.W. contend that S.H. accused them of child abuse in retaliation for A.W.'s having given evidence the previous week that further limited the biological parents' visitation time with J.C.W.
[4] The statute states in relevant part: "Upon the receipt of a report concerning the possible occurrence of abuse or neglect, the law enforcement agency or the department of social and health services must investigate and provide the protective services section with a report in accordance with chapter 74.13 RCW, and where necessary to refer such report to the court." RCW 26.44.050.
[5] Babcock v. State, 116 Wash.2d 596, 622, 809 P.2d 143 (1991); Waller v. State, 64 Wash.App. 318, 824 P.2d 1225 (1992); Lesley v. Dep't of Soc. & Health Servs., 83 Wash.App. 263, 921 P.2d 1066 (1996); Gilliam v. Dep't of Soc. & Health Servs., 89 Wash.App. 569, 950 P.2d 20 (1998); Beltran v. Dep't of Soc. & Health Servs., 98 Wash. App. 245, 989 P.2d 604 (1999), review granted, 140 Wash.2d 1021, 10 P.3d 405 (2000); Tyner v. Dep't of Soc. & Health Servs., 141 Wash.2d 68, 1 P.3d 1148 (2000).
[6] DSHS concedes that it owed a duty to J.C.W. to "conduct a reasonable investigation." Brief p. 9 n 3.
[7] According to Panitz, the home support specialists' duties are to "work with families providing remediation and parenting skills and home improvement services, one-on-one working with families in the home." CP at 28. They are not social workers; they are "paraprofessionals." CP at 33. There is no formal educational requirement for becoming a home support specialist. Home support specialist Stinson described her job as follows:

"We work with the social workers with families to help them to reestablish their life sometimes. We go into the home, we teach them household management, and we teach them how to get out and get community resources. We also help families ... with finding homes... try to help them find an affordable house for living because sometime the kids are going to be coming home. And we go into the home and we help them find housing and community resources, furniture and different things that they might need for the home. And we also teach them some aspects of safety in the home, too, with the children."
CP at 42-43.
[8] Three DSHS officials testified that home support specialists are qualified and authorized to inspect for diaper rash or other injuries to a child. Even so, one official conceded, "We clearly do not have the expertise, the qualifications to do a sexual abuse examination[.] ... If by spreading the [vaginal] lips and looking internally you're implying that the worker is doing a forensic examination, that clearly would not have been appropriate." CP at 101-02.
[9] Even if Francis has qualified immunity, the State can still be liable for negligent investigation. Waller v. State, 64 Wash.App. 318, 334, 824 P.2d 1225 (1992).
[10] Francis stated in his deposition: "I had some female staff members, in fact, respond to [the biological parent's] allegation by having the child visually seen and examined and that subsequently to confirm, the child was taken to Mary Bridge Hospital to be seen by a specialist to determine whether or not the condition would indicate that the child had been sexually abused." CP at 98. But despite Francis's admission, there is some dispute over whether it was he or Reitzug who ordered the home support specialists to examine J.C.W. If Francis can prove at trial that he was not involved in the incidents that gave rise to this suit, he can avoid liability.
[11] Clerk's Papers (CP) at 106.
[12] Id.
[13] A "home support specialist" is a paraprofessional without a college degree, but with expertise in "homemaking." Id. at 397, 824 P.2d 1225.
[14] I accept the foster mother's version of the incident for purposes of this summary judgment appeal. Reynolds v. Hicks, 134 Wash.2d 491, 495, 951 P.2d 761 (1998); Higgins v. Stafford, 123 Wash.2d 160, 168-69, 866 P.2d 31 (1994).
[15] CP 215-16.
[16] CP 227-29.
[17] CP 231-32.
[18] The record contains only the second amended complaint.
[19] Br. of Appellant at 7.
[20] Fondren v. Klickitat County, 79 Wash.App. 850, 862-63, 905 P.2d 928 (1995).
[21] Dever v. Fowler, 63 Wash.App. 35, 44-45, 816 P.2d 1237 (1991), review denied, 118 Wash.2d 1028, 828 P.2d 563 (1992) (dismissal).
[22] Donaldson v. City of Seattle, 65 Wash.App. 661, 671, 831 P.2d 1098 (1992).
[23] Pettis v. State, 98 Wash.App. 553, 558-61, 990 P.2d 453 (1999).
[24] Corbally v. Kennewick Sch. Dist., 94 Wash. App. 736, 740-41, 973 P.2d 1074 (1999).
[25] Lambert v. Morehouse, 68 Wash.App. 500, 504-06, 843 P.2d 1116, review denied, 121 Wash.2d 1022, 854 P.2d 1084 (1993).
[26] Laymon v. Dep't of Natural Res., 99 Wash.App. 518, 531-32, 994 P.2d 232 (2000).
[27] Rodriguez v. Perez, 99 Wash.App. 439, 443, 994 P.2d 874, review denied, 141 Wash.2d 1020, 10 P.3d 1073 (2000) (citing Babcock v. State, 116 Wash.2d 596, 809 P.2d 143 (1991)); Corbally, 94 Wash.App. at 740, 973 P.2d 1074, Lesley v. Dep't of Soc. & Health Servs., 83 Wash.App. 263, 921 P.2d 1066 (1996), review denied, 131 Wash.2d 1026, 939 P.2d 216 (1997).
[28] Tyner v. Dep't of Soc. & Health Servs., 141 Wash.2d 68, 77, 82, 1 P.3d 1148 (2000); Rodriguez, 99 Wash.App. at 445, 994 P.2d 874.
[29] Pettis, 98 Wash.App. at 556, 990 P.2d 453.
[30] Tyner, 141 Wash.2d at 82, 1 P.3d 1148.
[31] Rodriguez, 99 Wash.App. at 450, 994 P.2d 874.
[32] E.g., Babcock, 116 Wash.2d at 596, 809 P.2d 143.
[33] E.g., Yonker v. Dep't of Soc. & Health Servs., 85 Wash.App. 71, 930 P.2d 958, review denied, 132 Wash.2d 1010, 940 P.2d 655 (1997).
[34] E.g., Tyner, 141 Wash.2d at 68, 1 P.3d 1148.
[35] Babcock, 116 Wash.2d 596, 809 P.2d 143.
[36] Babcock, 116 Wash.2d at 606, 809 P.2d 143.
[37] Babcock, 116 Wash.2d at 598, 809 P.2d 143.
[38] Babcock, 116 Wash.2d at 608, 809 P.2d 143.
[39] Babcock, 116 Wash.2d at 608, 809 P.2d 143.
[40] Tyner, 141 Wash.2d at 79, 1 P.3d 1148.
[41] Dunning v. Paccerelli, 118 Wash.2d 1024, 827 P.2d 1392 (1992).
[42] Pettis, 98 Wash.App. at 558-60, 990 P.2d 453.
[43] Pettis held that a child care provider cannot bring a "negligent investigation" cause of action in the first instance. Pettis, 98 Wash.App. at 560, 990 P.2d 453. If Division Three agrees with Pettis, Dunning's holdings are moot.
[44] Waller, 64 Wash.App. at 325, 824 P.2d 1225.
[45] Waller, 64 Wash.App. at 333, 824 P.2d 1225.
[46] Waller, 64 Wash.App. at 333, 824 P.2d 1225.
[47] Lesley, 83 Wash.App. 263, 921 P.2d 1066.
[48] Lesley, 83 Wash.App. at 273, 921 P.2d 1066.
[49] Yonker, 85 Wash.App. at 77.
[50] Yonker, 85 Wash.App. at 77, 930 P.2d 958.
[51] Gilliam, 89 Wash.App. 569, 950 P.2d 20.
[52] Gilliam, 89 Wash.App. at 571, 950 P.2d 20.
[53] Gilliam, 89 Wash.App. at 572, 950 P.2d 20.
[54] In re Estate of Shinaul M., 96 Wash.App. 765, 980 P.2d 800 (1999), review denied, 140 Wash.2d 1007, 999 P.2d 1259 (2000).
[55] Shinaul M., 96 Wash.App. at 770, 980 P.2d 800.
[56] Shinaul M., 96 Wash.App. at 772-73, 980 P.2d 800.
[57] Beltran v. Dep't of Soc. & Health Servs., 98 Wash.App. 245, 989 P.2d 604 (1999), review granted, 140 Wash.2d 1021, 10 P.3d 405 (2000).
[58] Beltran, 98 Wash.App. at 247-48, 989 P.2d 604.
[59] Beltran, 98 Wash.App. at 254, 989 P.2d 604.
[60] Beltran, 98 Wash.App. at 254, 989 P.2d 604.
[61] Pettis, 98 Wash.App. 553, 990 P.2d 453.
[62] Rodriguez, 99 Wash.App. 439, 994 P.2d 874.
[63] Tyner, 141 Wash.2d 68, 1 P.3d 1148.
[64] DSHS first appealed to Division One, but that is not material here.
[65] Tyner, 141 Wash.2d at 77, 1 P.3d 1148.
[66] Tyner, 141 Wash.2d at 83, 1 P.3d 1148.
[67] Miles v. Child Protective Servs. Dep't, 102 Wash.App. 142, 6 P.3d 112 (2000), review denied, 142 Wash.2d 1021, 16 P.3d 1266 (2001).
[68] Shinaul M., 96 Wash.App. at 765, 980 P.2d 800; Babcock, 116 Wash.2d at 610, 809 P.2d 143 (implying but not holding the proposition stated in the text).
[69] Beltran, 98 Wash.App. at 249-50, 989 P.2d 604. Division One has expressly recognized that this "negligent placement" type of claim should be distinguished from the other two types of claim. In Gilliam, Division One noted that in Lesley it had "recognized a cause of action for negligent investigation of a child abuse allegation, as distinct from negligent placement." Gilliam, 89 Wash.App. at 577 n. 6, 950 P.2d 20 (emphasis added). See also Miles, 102 Wash. App. at 154, 6 P.3d 112 (distinguishing claim for negligently removing children from parental home and claim for negligently placing children in foster home).
[70] Division One has recognized that this type of claim should be distinguished from the others. As it noted in Yonker, "to say the State must act responsibly once it decides to act is not necessarily to say that the State is required to act." Yonker, 85 Wash.App. at 77, 930 P.2d 958.
[71] State v. WWJ Corp., 138 Wash.2d 595, 601-03, 980 P.2d 1257(1999); Morales v. Westinghouse Hanford Co., 73 Wash.App. 367, 370, 869 P.2d 120 (1994).
[72] According to the Restatement (Second) of Torts § 147(2), "One other than a parent who has been given by law ... the function of controlling, training, or educating a child, is privileged to apply such reasonable force ... as he reasonably believes to be necessary...." According to accompanying comment (e), persons other than a parent "do not share any immunity of the parent, and are under a liability to the child enforceable in a civil action of tort for any harm intentionally done ... unless the act which causes the harm is privileged. The privilege here stated ... protect[s] the actor from liability to the child enforceable by a civil action to which he would otherwise be subject." According to accompanying comment (f), persons other than a parent include "a guardian appointed by a court to take charge of the person of the child, the officers of a state orphanage or reformatory home," and various others. Cf. RCW 9A.16.100 (not unlawful for parent to use reasonable and moderate force); Jenkins v. Snohomish County PUD, 105 Wash.2d 99, 105, 713 P.2d 79 (1986), citing Foldi v. Jeffries, 93 N.J. 533, 461 A.2d 1145 (1983) (discussing immunity of a parent, as opposed to privilege of a non-parent).
[73] I reject the plaintiffs' apparent assertion that DSHS is somehow liable for a tort because the women who examined the child lacked college degrees or the title of "caseworker." They were homemakers who knew how to remove a child's diaper and look for redness, and their degrees and titles, if any, were irrelevant to that endeavor.
[74] Opinion, p. 995.