IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 39068-3-III |
| Respondent, | ) | (consolidated with |
| | ) | No. 39067-5-III) |
| v. | ) | |
| | ) | |
| CHRISTIAN J.N. ROBINSON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellate. | ) | |

FEARING, J. — The State of Washington charged appellant Christian Robinson with one count of murder in the second degree for the death of Christian Salazar. At the conclusion of the first trial, the superior court declared a mistrial due to a jury deadlock. The jury in Robinson's second trial adjudged him guilty of the charged crime. On appeal, Robinson argues he faced double jeopardy by reason of the second trial. He also contends errors marred the second trial. We discern only one nonprejudicial error. We affirm the conviction.

FACTS

In the early morning hours of February 3, 2020, Christian Robinson shot and killed Christian Salazar. Robinson alternatively claims that his gun fired by mistake and that he fired in defense of himself and a friend.

We relate the events leading to the confrontation between Christian Robinson and Christian Salazar, which events began on the evening of February 2, 2020. On Sunday,

February 2, Salazar drove to Crave, a downtown Spokane bar, with Mariesha Seyler, Anastasia Roa, Serena Springer, and Elijah Richardson. They traveled in Seyler's car, a white 2019 Toyota Corolla, and, on arrival at Crave, Salazar parked the vehicle in a bank parking lot located across from the bar.

After spending time at Crave, Christian Salazar and Elijah Richardson ambled down the street to Lucky's Bar. Instead of going with Salazar and Richardson, Mariesha Seyler, Anastasia Roa, and Serena Springer went to Seyler's car. While the three women smoked a cigarette inside the Toyota, a black Ford F-150 truck pulled next to it and parked. Three men, Christian Robinson, Shondell Buttram, and Valentine Rodriquez, exited the truck and spoke with the women. The women told Robinson and his friends they were from Los Angeles, were members of the Bloods gang, and were strippers. While still in the parking lot, Robinson, Rodriquez, and Buttram asked Seyler, Roa, and Springer if they were returning to Crave and offered the women a marijuana joint. Springer smoked the joint with the three men before she, Seyler, and Roa followed them into Crave. The group socialized in the bar, and Robinson bought Seyler a drink.

Mariesha Seyler, Anastasia Roa, and Serena Springer later exited Crave and rejoined Christian Salazar and Elijah Richardson in the bank parking lot. Salazar drove the group away in the Toyota. Richardson exited the Corolla two blocks later. Salazar deposited Springer at her house before the remaining trio headed to a nearby McDonalds.

After ordering food at the drive-through, Seyler, Roa, and Salazar rested in the Toyota, in the restaurant's parking lot, while eating.

Back at Crave, Christian Robinson realized his phone was missing. Robinson searched the bar and his pickup truck but could not find it. During his search of the truck, Robinson saw his handgun and put it in his pocket for safekeeping. Shondell Buttram, and Robinson employed the Find My iPhone website using Buttram's phone to locate Robinson's phone. When the website pinpointed the location of Robinson's phone, Robinson drove to the site in his truck. Rodriguez sat in the front passenger seat, while Buttram gave directions from the back seat. The pinpointed location happened to be the McDonald's where Mariesha Seyler, Anastasia Roa, and Christian Salazar parked. The McDonald's security camera captured the events that followed.

Christian Robinson drove his pickup truck into the parking lot and parked horizontally behind Mariesha Seyler's Toyota, parked vertically in a parking space. Because a six-foot drop into a rocky construction zone lay in front of the Toyota and beyond the parking lot curb, the Corolla was trapped.

Shondell Buttram told Christian Robinson to phone the police, but Robinson exited the Ford truck and walked toward the Toyota. He momentarily returned to the pickup and let Buttram out of the truck because the child lock prevented Buttram from leaving. Robinson again strolled toward the passenger side of the Toyota. Robinson spied Christian Salazar sitting in the driver's seat of the vehicle, Mariesha Seyler in the

3

front passenger seat, and Anastasia Roa in the back seat. Robinson knocked on the front passenger door's window, and Seyler rolled down the window. Robinson spoke angrily and loudly. Seyler told Robinson she did not have his phone. Robinson repeatedly yelled "Who has my effing phone. I just want my phone. Give me my phone." 1 Report of Proceedings (1 RP) (May 18, 2022) at 238.

As Christian Robinson stood by the front passenger door of the Toyota, Shondell Buttram approached the driver's side of the vehicle, abruptly opened the door, and screamed at Christian Salazar that, if the trio did not return Robinson's cell phone, Salazar was "going to get a beat down." 1 RP (May 19, 2022) at 379. A startled and petrified Salazar repeatedly told Buttram that he did not have the phone. According to Buttram, Salazar reached under his seat and then in his pockets. Buttram told Salazar to stop reaching. In trial testimony, Buttram denied ever touching Salazar.

The four surviving witnesses agreed at trial that Christian Robinson's gun fired and a bullet pierced Christian Salazar's head. Otherwise, the four differed as to the rapid events that occurred next. We recount the versions of Robinson, Shondell Buttram, Mariesha Seyler, and Anastasia Roa as they respectively testified at the second trial.

Christian Robinson testified that, while crouched outside of the front passenger window of the Toyota in the McDonald's parking lot, he turned his attention from Christian Salazar and Shondell Buttram toward Anastasia Roa in the rear seat because she spoke to him. Roa told Robinson she took his phone, to which he responded "'it's all

4

good'" while closing his eyes and shrugging his shoulders. 2 RP(May 26, 2022) at 897-98. He then heard a loud bang come from the Corolla. Robinson, fearing for his safety, jumped from the car with his legs spread. He tugged his gun from his pocket and opened his eyes to see Roa digging through her bag in the backseat of the Toyota. Robinson could not see inside the purse. Roa made eye contact with Robinson, threw the bag to her left, and nodded in his direction. Robinson looked at Mariesha Seyler in the front passenger seat, who had turned left, toward the inside the car, such that her back faced Robinson. Robinson feared for his life because Seyler placed her hands behind the seat where he could not see them. Robinson worried Seyler would shoot him. Seyler turned toward Robinson and yelped. Robinson wondered if someone stood behind him, so he turned. Robinson saw no one and gazed back toward the car. He noticed that Seyler and Roa looked in Salazar's direction and heard Seyler say "'That's my boyfriend.'" 2 RP (May 26, 2022) at 906. Robinson crouched down to look into the car and saw the driver side door open and Salazar and Shondell Buttram fighting. Salazar attempted to exit the car, but Buttram shoved him into his seat.

Christian Robinson avowed, during his testimony, that he fretted about the status of Shondell Buttram because Anastasia Roa, who claimed to be a member of the Bloods, said Christian Salazar was her boyfriend. So, Robinson concluded Salazar was also a gang member. Because Buttram tried to keep Salazar in the car, Robinson assumed Salazar had threatened Buttram. Salazar lunged at Buttram. Robinson watched Salazar

5

move his hands toward his pockets and heard Roa yell. His attention briefly turned toward Roa but quickly returned to Salazar, who was lunging again at Buttram.

During trial testimony, Christian Robinson averred that he saw Christian Salazar reach under the driver seat and believed he was grabbing a gun. Robinson, fearing for Shondell Buttram's life, reached into the car. He lunged after the driver through the window of the front passenger door. Robinson's entire torso entered through the window. He recognized that he had his handgun in his right hand, and he swung the gun at Salazar to try to stop him from attacking Buttram. He swung at Salazar five times and violently hit him in the head four times. While swinging his arm back on the fifth swing, Robinson heard a "clink." 2 RP (May 26, 2022) at 929. Robinson explained:

> Well, this swing, I—I swing through, I make contact, and as I slide it across him, scrape it across him, I'm doing it as hard as I can, so at the end of my swing, I hit the back of the driver's seat, and at this time, I—I feel the handgun go off in my hand.

2 RP (May 26, 2022) at 932.

According to Christian Robinson, Christian Salazar faced left toward Shondell Buttram, with his back facing Robinson. When Robinson's gun fired, Mariesha Seyler yelled, pushed the front passenger door open, and ran from the car. Robinson fell to the ground. Seyler yelled at him to "call 911." 2 RP (May 26, 2022) at 935. Robinson pleaded "[w]here's [my] phone" because he wanted to call 911. 2 RP (May 26, 2022) at 936. Robinson heard Anastasia Roa tell 911 that Christian Salazar was still breathing.

6

At trial, Shondell Buttram testified that he opened the driver's side door on the Toyota to gain access to the driver, who he considered a gang member. As he opened the door, Christian Salazar looked startled and terrified. Buttram saw a red bandana hanging from the rearview mirror. Buttram told Salazar: "if we do not get the cell phone back, you're going to get a beat down." 1 RP (May 19, 2022) at 379. Salazar reached under the driver's seat and in his pockets for what Buttram believed to be a gun. Buttram told Salazar to stop reaching. Buttram averred that, while he stood at the driver's side door, he feared for his and Christian Robinson's safety. According to Buttram, when Salazar did not listen to his commands, he heard a "pop." 1 RP (May 19, 2022) at 397-98.

Mariesha Seyler testified that Christopher Robinson, while standing outside of the front passenger seat door where she sat, yelled "I just want my fucking phone" and stuck his gun through the passenger window and in front of Seyler's face. 1 RP (May 18, 2022) at 240-41. Robinson pointed the barrel of the gun at Christian Salazar. Robinson held the gun in front of Seyler's face for less than thirty seconds before firing. She felt heat from the shot on the front of her sweater. Seyler declared that, after the gun fired, Robinson yelled "'You should have gave me my fucking phone.'" 1 RP (May 18, 2022) at 241. Shondell Buttram yelled "'Why the hell did you do that.'" 1 RP (May 18, 2022) at 242-43.

At trial, Anastasia Roa testified that, when Shondell Buttram pulled the driver's side door of the Toyota open, Christian Salazar grew frightened. According to Roa,

7

when Christian Robinson pointed the gun, the gun was outside the car but at the window. The gun fired instantly after Robinson pointed it at Salazar.

Anastasia Roa averred that, after the gunshot, she called 911. The State played the 911 call for the jury. In the background of the recording, a listener can hear Christian Robinson yelling: "'Where's my phone.'" 1 RP (May 18, 2022) at 329. Roa testified she did not see any physical contact between Salazar and Buttram and she did not see any part of Robinson's body enter the front passenger window.

On the firing of Christian Robinson's weapon, Christian Salazar's head dropped. Forty-eight seconds elapsed between Robinson's exit from his pickup and the firing of the gun.

Christian Robinson entered his pickup truck, threw his gun on the floor, and moved the truck from behind the Toyota to a parking spot on the right of the sedan. Spokane Police Department Officer Anthony Guzzo arrived at the scene within six minutes of the shooting, and other officers arrived soon thereafter. Officer Guzzo saw Christian Salazar slumped over the driver's seat of the Toyota Corolla. Salazar's head bled. When Guzzo realized Salazar still had a pulse, he pulled him out of the vehicle and administered rescue breaths until the paramedics arrived. Paramedics could not save Salazar, and, at 2:05 a.m., he was pronounced dead at the scene.

Officers searched and photographed the Ford and the Toyota, and the area around the McDonald's restaurant. During a search of Christian Robinson's truck, the officers

8

seized, from the driver's floorboard, a Ruger .380 automatic pistol, still loaded and with a cartridge in the chamber. Law enforcement officers searched the Toyota Corolla, but found no weapon. At the police station, officers gained possession of Christian Robinson's cellphone by taking it out of Anastasia Roa's purse.

Pathologist Sally Aiken investigated the scene of the McDonald's shooting on the morning of Christian Salazar's death. She also performed an autopsy on Salazar. Dr. Aiken concluded that Salazar died from a gunshot wound to the head. The bullet entrance wound lay 3.5 inches above and 2.5 inches behind Salazar's right ear. At trial, Aiken testified that she found bleeding on the skull only in the immediate area of the bullet entrance wound. The absence of hemorrhaging elsewhere on the skull showed that no one had struck Salazar's head with a blunt force object unless in the area of the entrance wound.

## PROCEDURE

The State of Washington charged Christian Robinson with second degree murder based on the felony murder principle. The charging information did not allege accomplice liability. The succinct information declared:

> MURDER IN THE SECOND DEGREE, committed as follows: That the defendant, CHRISTIAN J. ROBINSON, in the State of Washington, on or about February 03, 2020, while committing or attempting to commit the crime of Second Degree Assault, and in the course of and in furtherance of said crime and in immediate flight therefrom, did cause the death of CHRISTIAN G. SALAZAR, a human being, not a participant in such

9

> crime, and the defendant being at said time armed with a firearm under the provisions of 9.94A.825 and 9.94A.533(3).

Clerk's Papers (CP) at 1. Christian Robinson asserted the defense of defense of others.

### First Trial

Christian Robinson's first trial transpired in October 2021. During the first trial, the State proposed a jury instruction defining an "accomplice." Robinson objected to the instruction because of the absence of notice of an allegation of accomplice liability in the charging information. During the jury instruction conference, the State explained that it proposed the instruction because the term "accomplice" was used in another instruction defining "participant" for purposes of felony murder. The felony murder principle does not extend to the death of a participant in the crime. The trial court declined to give the instruction defining "accomplice."

Christian Robinson moved to bar the State from arguing accomplice liability during its closing argument. In response, the State agreed not to forward the argument, but planned to argue that Robinson pointed his gun to cause fear and apprehension before killing Christian Salazar. The State announced that, because Robinson asserted the defense of defense of others, it intended to argue to the jury that Shondell Buttram's conduct would assist the jury in considering whether Robinson's fear and the force he used were reasonable under the circumstances.

The trial court instructed the jury on the elements of second degree felony murder. The elements included proof beyond a reasonable doubt that Christian Robinson:

> committed or attempted to commit second-degree assault, that the defendant caused the death of Christian G. Salazar in the course of and in furtherance of such crime or in immediate flight from such crime, that Christian G. Salazar was *not a participant* in the crime of second-degree assault or attempt to commit second-degree assault, and that any of these acts occurred in the state of Washington.

CP at 1650 (emphasis added). Because of the presence of the term "participant" in this instruction, the court defined the word in a separate instruction:

> A *participant* in a crime is a person who is involved in committing that crime either as a principal or as an *accomplice*. A victim of a crime is not a *participant* in that crime.

CP at 1651 (emphasis added).

The State sought a first aggressor jury instruction. Christian Robinson objected to the State arguing that Shondell Buttram was a first aggressor and that Buttram's conduct as an aggressor was imputed to Robinson. The trial court asked the State whether it planned to argue in closing that Buttram was a first aggressor. The State did not directly answer the court's question. Instead, the State responded that Buttram's conduct was relevant to determining whether Robinson's fear was reasonable. The court expressed its belief that the State did not intend to argue accomplice liability but trusted that counsel would argue in line with the facts and the jury instructions. The trial court gave a first aggressor instruction. The instruction declared:

11

No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense or defense of another and thereupon kill or use, offer, or attempt to use force upon or toward[ ] another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor and that defendant's acts and conduct provoked or commenced the fight, then self-defense or defense of another is not available as a defense. Words alone are not adequate provocation for the defendant to be the aggressor.

CP at 1653-54.

The first aggressor instruction related to the self-defense instruction given by the trial court. The court instructed the jury:

It is a defense to a charge of second-degree murder that the homicide was justifiable as defined in this instruction. Homicide is justifiable when committed in the lawful defense of the slayer or any person in the slayer's presence or company when the slayer reasonably believed that the person slaying or others who the defendant reasonably believed were acting in concert with the person slaying, intended to inflict death or great personal injury.

CP at 1652. We note that this jury instruction incorrectly reads "*the person slaying* or others who the defendant reasonably believed were acting in concert with *the person slaying*." CP at 1652 (emphasis added).

The jury began deliberations on the afternoon of November 3, 2021. On November 4, the jury asked the trial court: "'Is a participant in concert with (in company with) one who commits assault included in the responsibility for that assault?'" CP at 241. We note that the jury question probably related to the jury instruction that mistakenly affords the slayer the homicide defense of justification "when the slayer

12

reasonably believed that the person slaying or others who . . . were acting in concert with the person slaying, intended to inflict death or great personal injury" "of the slayer or any person in the slayer's . . . company." CP at 1652.

The court emailed counsel for both parties indicating that, although it was inclined to respond "'refer to your jury instructions,'" it wished for counsels' input. CP at 319. Christian Robinson's counsel responded:

> This is the issue with the inclusion of the argument of accomplice liability when no instruction was permitted.
> The defense request[s] that the Jury be informed, as stated in arguments; and as prohibited by Judge Price, that their [sic] is no liability imputed to Mr. Robinson for the conduct of another.

CP at 314. The State responded: "The question specifically uses the term 'participant' and 'assault,' the court should refer the jury to the jury instructions that address assault, WPIC 35.50 and 'participant' WPIC 26.04.01." CP at 314.

The superior court rejected both parties' proposals and referred the jury back to the jury instructions. On the morning of November 5, the jury informed the trial court that it had reached an "impasse." CP at 1733-34. The court asked the jury about a reasonable probability of reaching a verdict within a reasonable period of time if given more time to deliberate. The jury unanimously replied that there was no reasonable probability.

The parties disagreed on how to proceed. Christian Robinson maintained that the jury deadlock resulted from a misunderstanding of the law based on the question it posed

13

to the trial court.  Robinson requested the trial court instruct the jury that he incurred no

imputed liability for the conduct of another and allow the jury more time to deliberate.

The State argued that the defense was speculating about the reasons behind the deadlock.

The trial court found the jury to be hopelessly deadlocked and declared a mistrial.

On January 6, 2022, the State, in preparing for the second trial, moved to amend

the charging information to include the language "'as an actor and/or accomplice.'"  CP

at 440-42.  The State maintained that, although the amendment was not necessary, it

served as notice of the State's intention to request a jury instruction defining

"accomplice" in the second trial.  Christian Robinson did not object to the request for an

amendment.  On January 19, the trial court granted the motion.  The amended

information read:

> MURDER IN THE SECOND DEGREE, committed as follows: That
> the defendant, CHRISTIAN J. ROBINSON, as an actor and/or an
> accomplice in the State of Washington, on or about February 03, 2020,
> while committing or attempting to commit the crime of Second Degree
> Assault, and in the course of and in furtherance of said crime and in
> immediate flight therefrom, did cause the death of CHRISTIAN G.
> SALAZAR, a human being, not a participant in such crime, and the
> defendant being at said time armed with a firearm under the provisions of
> 9.94A.825 and 9.94A.533(3).

CP at 485.

On April 26, 2022, Christian Robinson filed a motion to dismiss on double

jeopardy grounds.  Robinson argued that the trial court should have provided the jury

further instructions when it received the question during deliberations about

responsibility for a participant's conduct. The trial court denied the motion.

*Second Trial*

The second trial on Christian Robinson's second degree murder charge began on May 18, 2022. During trial, the parties showed photographs to the jury that included images of the rear view of the Toyota, the side of the vehicle, items outside the driver's door, the passenger side of the vehicle, the front of the vehicle, a hand watch outside of the driver's door, the interior of the driver's door, items inside the driver's door's pocket, the front interior of the car, the steering wheel and center console, a hamburger bag, a hamburger wrapper, a soda cup, blood on the center console, blood on the driver's floor mat, and blood on the interior of the passenger door.

When questioned by the State on direct about the shooting, Shondell Buttram testified:

> Q. What did the driver of the car do after the pop?
> A. I don't know. I stepped away. I don't remember.
> Q. Okay. Do you remember saying anything to Mr. Robinson?
> A. I do not remember anything after I heard that pop.
> Q. *Do you remember testifying previously under oath that after the pop, you told Mr. Robinson, "What the hell, Chris?"*
> A. *If that is what I said under oath, that is what you have. I no longer remember.*

2 RP (May 19, 2022) at 379-80 (emphasis added). In reference to the emphasized portion of the block quote above, defense counsel asked Buttram on cross-examination:

> Q. Your current mental state after this when speaking to law enforcement, can you describe it?   Do you remember that?
> A. Shock, fear.
> Q. Based upon your training, when you gave those statements, is that a good time to get reliable information when someone's in shock?
> A. Negative.

2 RP (May 19, 2022) at 398.  On redirect, the State posed the following line of questioning to Buttram:

> Q. Okay.  Sir, did you make a phone—when you were talking to the police officers, did you make a phone call and talk to your mother at some point?
> MR. KUHLMAN [defense counsel]: Objection.  Scope.
> THE COURT: It is beyond the scope.  It's beyond the scope of cross.  There's no question about a phone call being made.
> . . . .
> Q. . . .  After this event, did you make a phone call to your mother talking about that incident and what happened?
> A. At the police station?
> Q. Yes.
> A. Yes, I called my mother.
> MR. KUHLMAN: I'm going to object to the scope again.
> THE COURT: This gets back to—no, I'm going to overrule it at this point—
> MR. KUHLMAN: Thank you.
> THE COURT: —as to whether it gets to the issue that we're talking about.  Go ahead.
> BY MR. NAGY [prosecuting attorney]:
> Q. Did you tell her on the phone that my friend Chris did something horrible tonight to someone and I was there?
> A. I have no idea.
> Q. Do you recall telling her he killed someone?
> A. I have no idea.
> Q. Do you recall telling her he shot someone and I was there and he did something really fucked up?
> A. I have no idea.

16

1 RP (May 19, 2022) at 414-15.

Firearms expert Martin Romberg testified on behalf of the State. Romberg explained that he performed the "mallet test" on Christian Robinson's firearm. A mallet test is a routine impact test performed in a laboratory whereby the administrator of the test repeatedly strikes a firearm with sharp blows from a heavy rubber mallet in a variety of locations on the firearm in order to discern if a blow will force a discharge. None of the mallet strikes resulted in a bullet firing. Romberg opined that, based on the test, Robinson's gun could not have fired without the trigger being pulled.

Expert Martin Romberg also performed a trigger pull test of Christian Robinson's gun. The test involves hanging weights on the trigger. The test operator increases the amount of the weight until the trigger moves. The test of Robinson's firearm showed that the trigger needed six and one-half pounds of force to pull. During trial, the State handed Romberg two three-pound weights for the purpose of demonstrating to the jury the approximate weight necessary to pull the trigger on Robinson's gun. The State proposed to pass the weights through the jury box so that each juror could feel the six pounds. Robinson objected to this presentation of demonstrative evidence, which objection the trial court overruled. The jurors then felt the weights.

Martin Romberg testified that Christian Robinson's gun possessed two working safety functions, neither which function Robinson had activated at the time of the shooting.

17

No. 39068-3-III; consolidated with 39067-5-III
*State v. Robinson*

The following exchange transpired when defense counsel cross-examined lead

detective Wayne Downing about what might be visible in the Toyota if a person were

standing by the passenger door, where Christian Robinson had stood:

> Q. Okay.  So I'm a foot taller than the car.  Now, if I was on the passenger's side looking into the driver's seat, if I'm a foot taller and I'm right up on it, would I be able to see in it or would I have to bend down?
> [PROSECUTOR]: Objection, Your Honor, as far as relevance and also beyond the scope of the—
> THE COURT: It is beyond the scope, but as to relevance, whether you can see into or not, Mr. Kuhlman, I would sustain the objection as to relevance.
> [DEFENSE COUNSEL]: May I attempt to cure and rephrase?
> THE COURT: You can rephrase.
> BY MR. KUHLMAN [DEFENSE COUNSEL]:
> Q. Detective Downing, you were present when Dr. Aiken was talking about the path of the bullet?
> A. Yes.
> Q. And when she was talking about the path of the bullet, you were here when she said pretty much on a straight plane?
> A. Yes.
> Q. When she said that, based upon your training and experience with someone allegedly firing a weapon that travels a straight point where the injured party is sitting and this was the location, to see and to have that path, just the path, could a standing person do that?
> A. I don't—I'm having a hard time understanding your question versus—
> Q. If someone's standing and the driver is shot, if they're right up on the car, right up on that window, first of all, can they see the driver?
> [PROSECUTOR]: Objection.  Your Honor.
> THE COURT: . . . When you say they can see the driver, we have no idea what we're—there's no basis for the question.  Go back to where you were.  You were asking a question about something else, and now you've got, "Can they see the driver?"
> BY MR. KUHLMAN:
> Q. Standing by that Corolla, so it's four feet eight inches, if I'm a foot taller than it—

18

> A. Yes, factory dimensions are 4.75 inches.
>
> Q. If someone's standing right next to that door, are they able to see in?
>
> [PROSECUTOR]: Again, Your Honor, objection.
>
> [DEFENSE COUNSEL]: Your Honor, we—
>
> THE COURT: When you say, "they are able to see in."
>
> BY MR. KUHLMAN:
>
> Q. Would the person shooting the firearm be able to see in from the passenger side?
>
> [PROSECUTOR]: Objection, Your Honor.
>
> THE COURT: Again, you're—there's no basis—I will sustain the objection.
>
> [DEFENSE COUNSEL]: Thank you. I'll move on.

2 RP (May 25, 2022) at 831-33.

Christian Robinson testified on his behalf. His counsel asked him about whether

he saw Shondell Buttram on the driver's side of the Toyota Corolla:

> Q. Now, when you're asking where your phone is, do you know where Buttram is or what he's doing?
>
> A. No, I never looked back after I opened his door. I was trembling and nervous so I just focussed [sic] on what I was doing.

2 RP (May 26, 2022) at 893.

> Q. And you don't check to see where your friend is to help you out, even though you're frozen in fear?
>
> A. No. All I can think about is what the first part of talking to them would be, which is knocking on the window, that's all I would think about.
>
> Q. Did you ever see Mr. Buttram initially go over to the driver's side of the car?
>
> . . . .
>
> A. No, I never looked back.

The prosecution asked Christian Robinson:

> Q. No, sir, I didn't say if you looked back. What I'm saying, as

19

you're standing at the passenger side of the car, did you ever see Buttram go around to the driver's side of the car?

A. No.

Q. Did you ever see Buttram open the door of the driver's side?

A. No.

Q. Okay. Now, look behind you, this is Exhibit P-9. Is that—and that has previously been identified as the Corolla. Is your testimony that you were standing on this side of the car and you didn't see Buttram open the driver's side of the car? Is that correct?

. . . .

A. No.

. . . .

Q. So you're standing, and you say you can see Ms. Seyler in the passenger, Ms. Roa in the back seat, but you don't see the driver of the car?

A. No, I'm not looking at him at all.

Q. And you don't notice the door's been opened?

. . . .

A. No . . . I'm focussed [sic] on talking to Mariesha Seyler.

Q. And my question is, do you see the driver at this point?

A. I'm not looking at the driver.

. . . .

Q. Go ahead with the video. Stop. And is that Buttram following you to the Corolla?

A. Yes.

Q. Your testimony is you didn't notice any of that?

A. I never looked back. The only way I know that is by this video.

. . . .

Q. Okay. Keep playing. Stop. Freeze the video. Is that Mr. Buttram coming around to the driver's side?

A. Yes.

Q. And your testimony is you didn't see him coming over here?

A. No.

2 RP (May 26, 2022) at 970-76.

Q. . . . So take us forward now from the point now you're turning and get eyes back on the car, what is occurring?

A. . . . [Seyler and Roa were] looking at the driver's side of the vehicle . . .

Q. And what did that cause you to do?

A. It caused me to crouch down and look through the window to see what they were looking at.

Q. . . . So at this point when you're turning, when you look behind and you're turning, are you standing up?

A. Yes. I'm at a—yes, I'm standing up.

Q. So from you standing up, can you describe to the jury your ability to see in the car, what you can see, who you can see when you're standing up?

A. All I can see is the individuals' backs.

Q. All right. And can you see all three?

A. I can only see the front passenger and the back passenger.

Q. So she says that, you crouch down to look in to see what's going on, and what do you see?

A. When I looked through the window, I see that the driver, who I now know is Christian Salazar, and Shondell Buttram are fighting.

. . . .

Q. And I want to be clear, at this point when you see what's going on, with what you were seeing, is this the first point you saw Buttram?

A. Yes.

Q. Okay. So do you have any idea at that point in time how this fight started with those two?

A. No.

2 RP (May 26, 2022) at 905-08.

After the defense rested, the State moved the court to permit the jury to view the Toyota Corolla. The State argued that a view of the car's size and cramped interior would help the jury better understand the conditions at the shooting and rebut Christian Robinson's testimony that he could not see events transpiring on the opposite side of the car. Robinson objected to a jury view of the Toyota. The trial court granted the State's request. The jury walked around the Toyota. The trial court precluded jurors from touching or entering the vehicle.

21

During the jury instruction conference, the State's attorney commented:

> Yes, Your Honor. We only are charging and are—the entire charge of the second degree murder is based on the third and final paragraph. It's an act done with the intent to create apprehension and fear of bodily injury. That's what the evidence—that's what we're arguing, that that's the only kind of second degree assault that we're arguing here is that Mr. Robinson pulled out the gun and pointed at these people to scare them. We're not arguing, and we've presented no evidence of the other two of an intentional shooting or an offensive—or a striking of another person.
>
> Any contact between Mr. Buttram and Mr. Salazar is not relevant as to the second degree murder, based on a second degree assault. Strictly, we are only arguing and only presented evidence that Mr. Robinson intended to cause fear and apprehension by pulling out the gun.

2 RP (May 24, 2022) at 629.

We quote in numerical order five of the many jury instructions delivered by the trial court. The accomplice instruction read:

INSTRUCTION NO. 6

> A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:
>
> (1) solicits, commands, encourages, or requests another person to commit the crime; or
>
> (2) aids or agrees to aid another person in planning or committing the crime.
>
> The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.

CP at 1942.

22

The to-convict jury instruction declared:

INSTRUCTION NO. 8

To convict the defendant of the crime of murder in the second degree, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about the 3rd day of February, 2020, the defendant committed or attempted to commit Second Degree Assault;

(2) That the defendant caused the death of Christian G. Salazar in the course of and in furtherance of such crime or in immediate flight from such crime;

(3) That Christian G. Salazar was not a participant in the crime of Second Degree Assault or attempt to commit Second Degree Assault and

(4) That any of these acts occurred in the State of Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

CP at 1944.

The trial court defined "participant:"

INSTRUCTION NO. 16

A "participant" in a crime is a person who is involved in committing that crime, either as a principal or as an accomplice. A victim of a crime is not a "participant" in that crime.

CP at 1952.

The superior court instructed the jury on self-defense and defense of others:

23

INSTRUCTION NO. 18

A person is entitled to act on appearances in defending himself or another, if that person believes in good faith and on reasonable grounds that he is in actual danger of great personal injury, although it afterwards might develop that the person was mistaken as to the extent of the danger.

Actual danger is not necessary for a homicide to be justifiable.

CP at 1954.

The trial court's first aggressor instruction read:

INSTRUCTION NO. 23

No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense or defense of another and thereupon kill or use, offer, or attempt to use force upon or toward another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense or defense of another is not available as a defense. Words alone are not adequate provocation for the defendant to be the aggressor.

CP at 1959. Christian Robinson objected to jury instruction 23 on the basis that the evidence did not suggest that either he or Shondell Buttram were first aggressors. He contended the undisputed evidence established that he merely spoke words that demanded return of the cellphone.

During the State's closing argument, the prosecutor argued that both Christian Robinson and Shondell Buttram acted as aggressors. The State further argued that Robinson, Buttram, and Valentine Rodriquez were accomplices of one another. For example, the State's attorney intoned:

[MR. NAGY:] There's an instruction on standing your ground, and again, you should, a hundred percent, the law allows you can stand your ground. This was not standing your ground, ladies and gentlemen. Mr. Robinson and Mr. Buttram and Mr. Valentine weren't standing their ground. They were on the attack that night. They were on the attack to get their phone. They get there in the parking lot, they surround the car, they open door. When you open someone's car door, that's not standing your ground. That's going on the attack.

MR. KUHLMAN: Objection as to facts, as to vague.

THE COURT: Overruled.

MR. NAGY: The door's open, Mr. Robinson's on the other side demanding his phone through the window, and he sticks his arm—when you stick your arm with a gun, that's not standing your ground, ladies and gentlemen. That's going on the attack. And this wasn't, oh, I was just standing my ground in the McDonald's parking lot. They were attacking in that parking lot. They were attacking to get the phone. That's not a lawful use of force.

And the law also says this, ladies and gentlemen: No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense or defense of another and thereupon kill or use, offer or attempt to use force upon or toward another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense or defense of another is not available as a defense. Words alone are not adequate provocation for the defendant to be the aggressor, and we have well beyond words, ladies and gentlemen.

Mr. Robinson was the aggressor that night. Mr. Buttram was with him in that. They were the aggressor. Is blocking in a car, surrounding a car, opening the door, is that something likely to provoke a belligerent response? Yes. If somebody comes at you at McDonald's, opens the door, sticks a gun, is that likely to provoke a belligerent response? Yes. If anyone's arguing self-defense that night, it's Mr. Salazar and Ms. Seyler and Ms. Roa who were in that car. If anyone had a right to self-defense that night, it was those three people, because Mr. Robinson and his friends, they were the aggressors, they were the aggressors that night. There is no self-defense here, ladies and gentlemen. The evidence shows there is no self-defense here.

25

You can't go up to someone—John can't go up to Bill with a handgun and push Bill and then threaten Bill, and Bill goes, oh shit—and then the other guy pull a gun. Let me do that again. John can't go up to Bill and push Bill and threaten Bill and then say, Bill was reaching for his gun, so I killed him. You can't go up to somebody and kill him, oh, I thought he was acting in self-defense. No, that's what this says. You cannot do something—you can't be the aggressor and then shoot and kill somebody in self-defense. You can't make them react or claim you were in fear because you created that situation. Self-defense is not available to you under the law.

3 RP (May 26, 2022) at 1060-62.

In the State's rebuttal closing, the prosecuting attorney commented:

We don't have to prove they sat down and wrote out a plan. We don't have to talk about anything or present any evidence that they talked about what they were going to do once they got and found the phone. That's what we have to prove. We have to prove that Mr. Buttram was present and he was ready, willing, and able to assist Mr. Robinson in his actions that night. That's what we have to prove, and that's what the evidence did show.

3 RP (May 27, 2022) at 1088. Later the State's counsel added:

And were they mad? Yeah, Mr. Buttram—yeah, Mr. Buttram, who was with him to get that phone who was working with them to get the phone, Mr. Buttram said yeah, I'm going to give a beat down. He's on one side of the car saying you're going to get a beat down.

3 RP (May 27, 2022) at 1093. Toward the end of rebuttal closing, counsel remarked:

But, again, according to the instruction, you can take a look at what the state has to prove for an accomplice, and Mr. Robinson's responsible under that instruction. And again, Instruction No. 6, okay, all right, in this particular case, Mr. Buttram and Mr. Salazar were working together. They were an accomplice—Mr. Buttram was an accomplice to what Mr. Robinson did. Mr. Robinson, likewise, was responsible for what Mr. Buttram was doing, because they were working as a team. And again, we

> don't have to show there's any written plan or any discussion about what happened. But remember, these people, Mr. Valentine, Mr. Buttram, and Mr. Robinson were all together in the truck driving up together. Buttram's directing Mr. Robinson and they got out of the car and they acted together. They went up there together, they surrounded the car together, and it was Mr. Robinson that pulled the gun out.

3 RP (May 27, 2022) at 1097-98.

The jury found Christian Robinson guilty of second degree felony murder and delivered a special verdict finding that he was armed with a firearm at the time of the crime. Robinson was sentenced to 240 months of confinement, including 60 months for the mandatory firearm enhancement.

## LAW AND ANALYSIS

On appeal, Christian Robinson argues (1) the second trial breached his constitutional right to be free from double jeopardy (2) the jury instructions (a) did not permit the State's accomplice liability argument during closing, (b) were not manifestly apparent to the jury in light of the State's argument, and (c) decreased the State's burden to prove every element of the crimes charged beyond a reasonable doubt, (3) the trial court abused its discretion by permitting the jury to hold the weights as demonstrative evidence, (4) the State committed prosecutorial misconduct by asking leading questions to Shondell Buttram on direct, which misconduct violated Robinson's right to a fair trial and to confront the witnesses against him, (5) the trial court abused its discretion when allowing the State to ask Buttram about a phone call with his mother, (6) the trial court

27

abused its discretion and deprived Robinson of his right to a fair trial when allowing the jury to view the Toyota Corolla immediately before deliberations, and (7) the cumulative error doctrine demands reversal. Robinson also filed a statement of additional grounds in which he argues defense counsel violated his right to the effective assistance of counsel. We address the assignments of error in such order.

## Double Jeopardy

Christian Robinson insists that his second trial violated the constitutional prohibition against double jeopardy. Robinson agrees that the double jeopardy clause generally does not preclude a retrial after a mistrial resulting from a hung jury. Robinson also does not argue that the trial court prematurely granted the mistrial. He instead relies on the rule that double jeopardy precludes a second trial when the State, by its conduct during the first trial, recognized the insufficiency of its case.

Christian Robinson underscores the question posed by the jury to the trial court: "'Is a participant in concert with (in company with) one who commits assault included in the responsibility for that assault?'" CP at 241. Later when the jury announced a stalemate, the State, according to Robinson, recognized it could not convict him of second degree murder because it had failed to allege and present argument on accomplice liability for the assault by Shondell Buttram on Christian Salazar. According to Robinson, the State then capitalized on the jury's confusion over accomplice liability, as evidenced by the juror question, by consenting to the declaration of a mistrial.

We do not agree that the jury necessarily asked, by its jury question, whether it could hold Christian Robinson legally responsible for the conduct of another, such as Shondell Buttram. Although unlikely, the jury may have pondered Buttram's liability. Regardless, we would speculate as to whether the jury reached a deadlock because of any puzzlement over accomplice liability. The jury could have reached gridlock because of any number of differences, including disagreements about whether Robinson intended to assault one of the other two women in the car, whether Robinson personally was a first aggressor, or whether Robinson reasonably believed that Christian Salazar endangered his safety or the safety of Buttram. After posing the one question, the jury continued to deliberate for hours without submitting any further questions.

The State never impliedly or expressly conceded that it failed to present sufficient evidence to convict Christian Robinson of second degree murder. The State only conceded an impasse in jury deliberations. The State never asked for a mistrial or dismissal of charges without prejudice.

The Fifth Amendment to the United States Constitution and article I, section 9 of the Washington State Constitution prohibit the State from twice putting a person in jeopardy for the same offense. *State v. Ervin*, 158 Wn.2d 746, 752, 147 P.3d 567 (2006). The double jeopardy clause bars the State from retrying a defendant when (1) jeopardy previously attached, (2) jeopardy was terminated, and (3) the defendant is in jeopardy a second time for the same offense in fact and law. *State v. Ervin*, 158 Wn.2d 746, 752

(2006). Jeopardy may be terminated when the court dismisses the jury without the defendant's consent and the dismissal is not in the interest of justice. *State v. Ervin*, 158 Wn.2d 746, 753 (2006). Nevertheless, jeopardy is not terminated, and therefore does not bar a second trial, when unforeseeable circumstances arise during the first trial making its completion impossible, such as the failure of a jury to agree on a verdict. *Green v. United States*, 355 U.S. 184, 188, 78 S. Ct. 221, 2 L. Ed. 2d 199 (1957).

The Double Jeopardy Clause seeks, in part, to prevent the State from manipulating the trial process by terminating the proceedings when it appears its case is weak or the jury is unlikely to convict. *Crist v. Bretz*, 437 U.S. 28, 35-36, 98 S. Ct. 2156, 57 L. Ed. 2d 24 (1978). When circumstances suggest the prosecution's action was motivated by a concern it could not prove its case, retrial is impermissible. *State v. Wright*, 165 Wn.2d 783, 805, 203 P.3d 1027 (2009). Conversely, when the State does not engage in bad faith or manipulation, double jeopardy principles are not offended. *United States v. Tateo*, 377 U.S. 463, 467-68, 84 S. Ct. 1587, 12 L. Ed. 2d 448 (1964); *State v. Wright*, 165 Wn.2d 783, 806 (2009).

Christian Robinson relies on *Downum v. United States*, 372 U.S. 734, 736, 83 S. Ct. 1033, 10 L. Ed. 2d 100 (1963), when arguing that the State acknowledged the insufficiency of its evidence to convict him on the second degree murder charge. In *Downum*, the prosecution asked that the jury, which had already been selected and sworn, be discharged because a key witness for two counts had not been subpoenaed. The court

dismissed the jury over the defendant's objection. A second trial began two days later, wherein the defendant pled double jeopardy. The defendant's plea was overruled and he was found guilty. The United States Supreme Court, in *Downum*, held that double jeopardy barred retrial.

In holding the double jeopardy clause barred retrial, the United States Supreme Court, in *Downum v. United States*, reasoned that allowing the State to retry a defendant under such circumstances was susceptible to abuse by prosecutors unprepared to try their case. Lack of preparedness by the government to continue the trial directly implicated policies underpinning both the double jeopardy provision and the speedy trial guarantee.

Christian Robinson astutely argues that the State must have worried that it failed to prove its case because, at the time the jury announced its impasse, the State resisted his request for a supplemental jury instruction to clarify that the jury could not find guilt based on accomplice liability and, after the declaration of a mistrial, immediately amended its information to allege accomplice liability. We disagree that these actions alone or in combination formed an admission of a failure of evidence or constituted bad faith. The State retained a right to resist any supplemental jury instruction and to amend the information. It engaged in no manipulation. It engaged in no affirmative conduct to directly procure a mistrial. The State took advantage of the deadlock, but it did not affirmatively seek a mistrial. Robinson cites no case law supporting a finding of bad faith or the termination of jeopardy under such circumstances.

31

The State could have even insisted during the first trial for the rendering of an accomplice liability instruction despite failing to plead accomplice liability. An information need not allege accomplice liability in order to state the nature of the charge. *State v. Teal*, 117 Wn. App. 831, 838, 73 P.3d 402 (2003), *aff'd*, 152 Wn.2d 333, 96 P.3d 974 (2004). Charging the accused as a principal gives adequate notice of the potential for accomplice liability. *State v. Rodriguez*, 78 Wn. App. 769, 774, 898 P.2d 871 (1995).

The closest case to Christian Robinson's circumstances may be *Illinois v. Somerville*, 410 U.S. 458, 469, 93 S. Ct. 1066, 35 L. Ed. 2d 425 (1973). The United States Supreme Court refused to bar a second trial on double jeopardy grounds when the government dismissed the prosecution midtrial because of a defective charging instrument. Such an error was not susceptible to the manipulation of the trial process at issue in *Downum* since a prosecutor would unlikely deliberately plant the seed of a certain reversal by filing a defective indictment.

## Jury Instruction 23

Christian Robinson next argues that jury instruction 23, the first aggressor instruction, did not permit the jury to impose first aggressor status on him based on the conduct of his friends. Therefore, the State acted impermissibly when it sought, through its presentation of evidence and its closing argument, to impose the status of first aggressor on Robinson based on accomplice liability. According to Robinson, this

argument impermissibly decreased the State's burden to prove every element of the crimes charged beyond a reasonable doubt.

In response, the State characterizes Christian Robinson's assignment of error as one of prosecutorial misconduct during closing argument, not of instructional error, and the State argues that Robinson forfeited an argument of misconduct because of his failure to object during the summation. The State further contends that, even though the jury instructions contained no error, any instructional error benefited Robinson by communicating to the jury that the definition of accomplice was irrelevant to determining first aggressor status.

In reply, Christian Robinson denies that he argues prosecutorial misconduct resulting from the State's attorney beseeching the jury, during summation, to attribute the conduct of Shondell Buttram to Robinson for purposes of being a first aggressor. Nevertheless, Robinson's assignment of error 2 reads that the State impermissibly argued accomplice liability to impute first aggressor status on him, an assignment suggesting prosecutorial misconduct. Assuming any assignment of error from Robinson based on prosecutorial misconduct, we decline to address the assignment. Robinson fails to develop any argument in support of the assignment in the body of his briefs. We need not consider arguments undeveloped in the briefs and for which a party has not cited authority. *Bercier v. Kiga*, 127 Wn. App. 809, 824, 103 P.3d 232 (2004).

Christian Robinson argues that jury instructions 6 and 23 did not render the

applicable legal standard the jury manifestly apparent to the average juror because the

two instructions did not indicate to the jury that accomplice liability could be considered

when determining his status as the first aggressor. Also, the instructions omitted a

connection between the definitions for the terms "accomplice," "defendant," and

"participant" and the first aggressor instruction.

To repeat, the jury instruction defining "accomplice," instruction 6, provided:

> A person is an accomplice in the commission of a crime if, with
> knowledge that it will promote or facilitate the commission of the crime, he
> or she either:
> (1) solicits, commands, encourages, or requests another person to
> commit the crime; or
> (2) aids or agrees to aid another person in planning or committing
> the crime.
> The word "aid" means all assistance whether given by words, acts,
> encouragement, support, or presence. A person who is present at the scene
> and ready to assist by his or her presence is aiding in the commission of the
> crime. However, more than mere presence and knowledge of the criminal
> activity of another must be shown to establish that a person present is an
> accomplice.

CP at 1942. The first aggressor instruction, instruction 23, reads:

> No person may, by any intentional act reasonably likely to provoke a
> belligerent response, create a necessity for acting in self-defense or defense
> of another and thereupon kill or use, offer, or attempt to use force upon or
> toward another person. Therefore, if you find beyond a reasonable doubt
> that the defendant was the aggressor, and that defendant's acts and conduct
> provoked or commenced the fight, then self-defense or defense of another
> is not available as a defense. Words alone are not adequate provocation for
> the defendant to be the aggressor.

34

No. 39068-3-III; consolidated with 39067-5-III
*State v. Robinson*

CP at 1959.

We decline to address Christian Robinson's assignment of error with regard to the first aggressor jury instruction because, although he objected to the instruction at trial, he did not object on the basis that the instruction failed to render the law manifestly apparent to the average juror. He also did not complain that instruction 23 lacked a connection to the accomplice jury instruction. He objected to jury instruction 23 solely on the basis that the evidence did not support a first aggressor instruction.

CrR 6.15(c) declares:

> Objection to Instructions . . . The court shall afford to counsel an opportunity in the absence of the jury to object to the giving of any instructions and the refusal to give a requested instruction or submission of a verdict or special finding form. *The party objecting shall state the reasons for the objection*, specifying the number, paragraph, and particular part of the instruction to be given or refused.

(Emphasis added.) (Boldface omitted). The rule requires timely and well-stated objections in order that the trial court may have the opportunity to correct any error. *State v. Scott*, 110 Wn.2d 682, 685-86, 757 P.2d 492 (1988). A failure to object to an instruction waives the issue on appeal. *State v. O'Brien*, 164 Wn. App. 924, 932, 267 P.3d 422 (2011). If a defendant raises one objection to an instruction at the trial level, but then challenges an instruction on different legal grounds for the first time on appeal, this court will not consider the new argument. *State v. Loos*, 14 Wn. App. 2d 748, 757, 473 P.3d 1229 (2020). Any objections to the instructions, as well as the grounds for the

objections, must be entered into the record to preserve review. *State v. Sublett*, 176

Wn.2d 58, 75-76, 292 P.3d 715 (2012) (plurality opinion).

Christian Robinson argues that the first aggressor jury instruction alone and

combined with other instructions lessened the State's burden of proving all elements of

the crime and thereby impacted his due process rights. In addition, an error affecting a

defendant's self-defense claim is constitutional in nature. *State v. Ackerman*, 11 Wn.

App. 2d 304, 315, 453 P.3d 749 (2019).

A defendant may raise an error for the first time on appeal when it is a manifest

error affecting a constitutional right. RAP 2.5(a)(3); *State v. Mills*, 154 Wn.2d 1, 6, 109

P.3d 415 (2005). Washington courts and even decisions internally have announced

differing formulations for "manifest error." First, a manifest error is one "truly of

constitutional magnitude." *State v. Scott*, 110 Wn.2d 682, 688 (1988). The error must

not only be constitutional in nature, but also apparent. Permitting every possible

constitutional error to be raised for the first time on appeal undermines the trial process,

generates unnecessary appeals, creates undesirable retrials, and wastes resources. *State v.

Lynn*, 67 Wn. App. 339, 344, 835 P.2d 251 (1992). Second, perhaps perverting the term

"manifest," some decisions emphasize prejudice, not obviousness. The defendant must

identify a constitutional error and show how, in the context of the trial, the alleged error

actually affected the defendant's rights. *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d

756 (2009).

Christian Robinson does not claim a manifest constitutional error, let alone explain why any error was obvious. Instruction 23 did not expressly address an accomplice's actions as they relate to determining his status as the first aggressor. As maintained by the State, any lack of clarity or any error in omitting from jury instruction 23 language informing the jury it was permitted to consider the conduct of Shondell Buttram in evaluating whether Robinson was the first aggressor benefitted Robinson. Robinson does not argue that the law precluded the jury from considering the conduct of Buttram. Thus, any confusion that arose amongst the members of the jury would have resulted in the jury concluding that it may only consider Robinson's behavior in determining his first aggressor status, which would have increased rather than diluted the State's burden to disprove self-defense. In turn, Robinson suffered no prejudice.

Sufficiency of Evidence for Jury Instruction 23

Christian Robinson also contends that the State failed to prove he acted as an accomplice of Shondell Buttram or Valentine Rodriguez when the predicate offense was committed solely by Robinson at a later time during the unfolding incident. Along these lines, he contends the State failed to prove beyond a reasonable doubt that he knew what Buttram intended to do such that Buttram's behavior could be attributed to him to make him vicariously liable as a first aggressor.

We review insufficient evidence claims for whether, when viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the

37

elements of the charged crime beyond a reasonable doubt. *State v. Embry*, 171 Wn. App. 714, 742, 287 P.3d 648 (2012). Sufficiency challenges admit the truth of the State's evidence and all reasonable inferences drawn from it. *State v. Embry*, 171 Wn. App. 714, 742 (2012). In analyzing the sufficiency of evidence, this court does not treat circumstantial evidence as less reliable than direct evidence. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). This court does not review the trier of fact's determinations on credibility and defers to the trier of fact with respect to conflicting testimony and the persuasiveness of evidence. *State v. Embry*, 171 Wn. App. 714, 742 (2012).

The State presented evidence that Valentine Rodriguez, Shondell Buttram, and Christian Robinson tracked Robinson's cell phone to the McDonald's parking lot. In order block the egress of the Toyota driven by Christian Salazar, Robinson parked his pickup behind the Corolla. After exiting his truck, Robinson returned to the vehicle to allow Buttram, who was locked inside, to depart the truck and walk with him to the Toyota. Buttram and Robinson stood on both sides of the Toyota. Because of the small size of the Toyota, Robinson could have seen Buttram open the driver's door and threaten Salazar. The jury heard sufficient evidence to conclude that Robinson on his own or in combination with Buttram acted as a first aggressor.

Demonstrative Evidence

Christian Robinson argues that the trial court erred in permitting the use of two dumbbells tied together as demonstrative evidence to allow the jury to sense the weight required to pull the trigger of his gun. He insists this evidence was not a scientific experiment and substantially differed from the physical requirements and operation of his gun. Robinson asserts that this error prejudiced him since the prosecution tasked the jury to decide whether he accidently discharged the weapon.

This court will not reverse the admission of demonstrative evidence unless the superior court abused discretion and that abuse of discretion prejudiced the defendant. *Jenkins v. Snohomish County Public Utilities District No. 1*, 105 Wn.2d 99, 107, 713 P.2d 79 (1986). The law encourages the use of demonstrative evidence when it accurately illustrates facts sought to be proved. *State v. Finch*, 137 Wn.2d 792, 816, 975 P.2d 967 (1999) (plurality opinion). Demonstrative evidence is admissible if the experiment was conducted under substantially similar conditions as the event at issue. *State v. Finch*, 137 Wn.2d 792, 816 (1999). The demonstrative must also be material and probative. *Jenkins v. Snohomish County Public Utilities District No. 1*, 105 Wn.2d 99, 107 (1986). The ultimate test for the use of an experiment as evidence is whether the test enables the jury to more intelligently consider the issues presented. *Jenkins v. Snohomish County Public Utilities District No. 1*, 105 Wn.2d 99, 107 (1986).

When demonstrative evidence will likely confuse the jury, raise collateral issues, or is more prejudicial than probative, a court should refuse its admission. *Jenkins v. Snohomish County Public Utilities District No. 1*, 105 Wn.2d 99, 107 (1986). The trial court may consider whether the evidence is merely cumulative and illustrative of issues already introduced and therefore not prejudicial or whether it is unique evidence of a factual assertion and potentially prejudicial. *Jenkins v. Snohomish County Public Utilities District No. 1*, 105 Wn.2d 99, 107 (1986).

Christian Robinson principally relies on *State v. Hunter*, 152 Wn. App. 30, 216 P.3d 421 (2009). Kenneth Miles Hunter appealed his second degree murder conviction claiming, in part, that the trial court erred in admitting a trigger pull device as demonstrative evidence. At Hunter's trial, the State called an expert who had created a trigger pull measuring device in the form of a ring that he claimed demonstrated the feel of pulling the trigger on Hunter's gun. He testified that he designed the device to enable jurors to discern the pressure needed to pull a trigger without handling a gun. He insisted the device used the same weight required to fire Hunter's gun. The expert conceded that a more accurate demonstration would entail use of the gun with its trigger rather than his ring device. The distance on the ring trigger pull was one inch longer than on the actual gun. The expert admitted the distance from the web of one's hand to the trigger or the device affected perceived trigger pull. The actual size of a person's hand also affected the perceived trigger pull.

On appeal in *State v. Hunter*, this court ruled that the trial court abused its discretion when permitting the expert to testify because of the numerous differences between the expert's ring pull device and the firearm Kenneth Miles Hunter used to kill his victim. This court reversed the murder conviction because the use of the trigger pull device gave the jurors an improper understanding of the amount of pressure needed to pull the trigger on Hunter's firearm. The demonstrative evidence prejudicially undermined Hunter's argument that he pulled the trigger on accident.

Christian Robinson contends the State's demonstrative evidence in his trial was even less scientific and less precise than the experiment employed in *Hunter*. At trial, the State indicated that Robinson's gun had a six-and-a-half-pound trigger pull, whereas the dumbbells weighed only a combined six pounds. The State maintains that, unlike in *Hunter* wherein the State claimed the demonstrative evidence represented the exact feeling of experiencing seven and a half pounds of trigger pull, it employed the demonstrative evidence in Robinson's trial only to show the jury the approximate weight required to pull the trigger on Robinson's gun.

We agree with the State. The dumbbells weighed six pounds, a half a pound less than the weight necessary to pull the trigger on the gun used by Christian Robinson. The State introduced the dumbbells to show the approximate weight necessary to pull the trigger on Robinson's gun, not the exact feeling of what it would be like to experience a six-and-a-half-pound trigger pull. The demonstrative evidence correlated to the pressure

needed to fire Robinson's gun. The trial court did not abuse its discretion in allowing use of the dumbbells.

Prosecutorial Misconduct

Christian Robinson argues that, by asking leading and argumentative questions to Shondell Buttram on redirect examination, the State committed prosecutorial misconduct, which deprived him of his right to a fair trial and to confront the State's witnesses. A defendant claiming prosecutorial misconduct must prove that the prosecutor's conduct was both improper and prejudicial. *State v. Ritchie*, 24 Wn. App. 2d 618, 638, 520 P.3d 1105 (2022), *review denied*, 1 Wn.3d 1006, 526 P.3d 851 (2023). To establish prejudice, the accused must show a substantial likelihood that the misconduct affected the jury's verdict. *State v. Thorgerson*, 172 Wn.2d 438, 442-43, 258 P.3d 43 (2011); *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008) (plurality opinion).

The following colloquy occurred during the State's redirect examination of Shondell Buttram:

> Q. Okay. Sir, did you make a phone—when you were talking to the police officers, did you make a phone call and talk to your mother at some point?
> MR. KUHLMAN: Objection. Scope.
> THE COURT: It is beyond the scope. It's beyond the scope of cross. There's no question about a phone call being made.
> . . . .
> Q. . . . After this event, did you make a phone call to your mother talking about that incident and what happened?
> A. At the police station?
> Q. Yes.

42

A. Yes, I called my mother.

MR. KUHLMAN: I'm going to object to the scope again.

THE COURT: This gets back to—no, I'm going to overrule it at this point—

MR. KUHLMAN: Thank you.

THE COURT: —as to whether it gets to the issue that we're talking about. Go ahead.

BY MR. NAGY:

Q. Did you tell her on the phone that my friend Chris did something horrible tonight to someone and I was there?

A. I have no idea.

Q. Do you recall telling her he killed someone?

A. I have no idea.

Q. Do you recall telling her he shot someone and I was there and he did something really fucked up?

A. I have no idea.

1 RP (May 19, 2022) at 414-15.

Christian Robinson complains about the State's questioning of Shondell Buttram on three grounds. First, the State did not move to treat Buttram as a hostile witness such that it could not ask leading questions. Second, assuming the State could ask leading questions on redirect, the State violated evidence rules by mentioning Buttram's purported statements under the pretext of refreshing his recollection. Third, the State introduced hearsay, for which no exception applied. In response, the State claims it posed the questions to impeach Buttram. The State, however, when addressing a different argument under assignment of error 5, asserts that it posed the same questions to rehabilitate Buttram. Because of the State's conflicting arguments, we do not consider

them when addressing either assignment of error. We address only whether the

introduction of the statements prejudiced Robinson.

The line of questioning challenged by Christian Robinson did not prejudice him

because Mariesha Seyler testified that Shondell Buttram said something to the effect of

"'Why the hell did you do that?'" at Robinson after Robinson fired the gun. 1 RP (May

18, 2022) at 242-43. Also, Buttram did not testify to having uttered the statements in

response to the leading questions from the prosecutor. Because of the lack of prejudice,

we also do not address whether any misconduct violated Robinson's right to confront the

witnesses against him and right to a fair trial.

Buttram Redirect Examination

Christian Robinson argues that the trial court abused its discretion when

overruling defense counsel's objection to questions to Shondell Buttram about his call to

his mother shortly after ruling that the subject was beyond the scope of cross-

examination. The State argues that the trial court did not err in allowing the State to

question Buttram about that phone call on redirect because the State did so for the

purpose of rehabilitating Buttram.

Redirect examination serves to clarify matters which may tend to be confused by

cross-examination and to rehabilitate the witness before the trier of fact. *State v. Gould*,

58 Wn. App. 175, 186, 791 P.2d 569 (1990). Whether redirect examination is within the

scope of cross-examination is a decision within the trial court's discretion. *State v.*

*Gould*, 58 Wn. App. 175, 186 (1990).

When questioned by the State on direct about the shooting, Shondell Buttram

testified:

> Q. What did the driver of the car do after the pop?
> A. I don't know. I stepped away. I don't remember.
> Q. Okay. Do you remember saying anything to Mr. Robinson?
> A. I do not remember anything after I heard that pop.
> *Q. Do you remember testifying previously under oath that after the pop, you told Mr. Robinson, "What the hell, Chris?"*
> *A. If that is what I said under oath, that is what you have. I no longer remember.*

1 RP (May 19, 2022) at 379-80 (emphasis added). Defense counsel asked Buttram on

cross-examination:

> Q. Your current mental state after this when speaking to law enforcement, can you describe it? Do you remember that?
> A. Shock, fear.
> Q. Based upon your training, when you gave those statements, is that a good time to get reliable information when someone's in shock?
> A. Negative.

1 RP (May 19, 2022) at 398. On redirect, the State posed the following line of

questioning to Buttram:

> Q. . . . Okay. After this event, did you make a phone call to your mother talking about that incident and what happened?
> A. At the police station?
> Q. Yes.
> A. Yes, I called my mother.
> MR. KUHLMAN: I'm going to object to the scope again.

45

> THE COURT: This gets back to—no, I'm going to overrule it at this point—
>
> MR. KUHLMAN: Thank you.
>
> THE COURT: —as to whether it gets to the issue that we're talking about.  Go ahead.
>
> BY MR. NAGY:
>
> Q. Did you tell her on the phone that my friend Chris did something horrible tonight to someone and I was there?
>
> A. I have no idea.
>
> Q. Do you recall telling her he killed someone?
>
> A. I have no idea.
>
> Q. Do you recall telling her he shot someone and I was there and he did something really fucked up?
>
> A. I have no idea.

1 RP (May 19, 2022) at 414-15.

As previously indicated, the State claims it asked Shondell Buttram questions on redirect about a phone call he made to his mother for the purpose of rehabilitating him as a witness, but the State, in response to Christian Robinson's argument under assignment of error 4, argued it posed such questions to Buttram to impeach him.  Because of the inconsistent arguments, we do not consider either of them in our analysis.

The State's questioning about Shondell Buttram's phone call to his mother did nothing to clarify matters that could have been confused on cross-examination.  The interrogation did nothing to rehabilitate Buttram as a witness because it did not establish whether he yelled "'What the hell, Chris,'" whether he was in shock or in fear when he made that statement to the police, or whether, if he was in shock or in fear, the statement

46

was reliable. CP at 489-90. We conclude that the trial court erred in allowing the State to question Buttram about the phone call he made to his mother after the shooting.

Evidentiary error is grounds for reversal only if it results in prejudice. *Bengtsson v. Sunnyworld International, Inc.*, 14 Wn. App. 2d 91, 99, 469 P.3d 339 (2020). An error is prejudicial if it materially affected the outcome of the trial. *City of Seattle v. Pearson*, 192 Wn. App. 802, 817, 369 P.3d 194 (2016). Because Mariesha Seyler testified that Shondell Buttram yelled something to the effect of "'[w]hy the hell did you do that'" to Christian Robinson after the gun fired, the introduction of the statements did not prejudice Robinson. 1 RP (May 18, 2022) at 243.

Jury View

Christian Robinson argues that the trial court abused its discretion when permitting a jury view of the Toyota. The State asked for the view to rebut Robinson's testimony that he could not see events on the other side of the car and because photos of the car did not aid the jury when assessing the credibility of Robinson's assertion. Robinson asserts that he never testified that he could not see events on the other side of the car. Robinson contends the jury view served only to unfairly inflame the passions of the jury and thereby deprived him of his right to a fair trial.

Christian Robinson does not expand on his argument based on his right to a fair trial. We need not consider arguments undeveloped in the briefs and for which a party has not cited authority. *Bercier v. Kiga*, 127 Wn. App. 809, 824 (2004).

47

CrR 6.9 permits a court to "allow the jury to view the place in which any material fact occurred." This court reviews a trial court's decision to permit a jury view for an abuse of discretion. *State v. Land*, 121 Wn.2d 494, 502, 851 P.2d 678 (1993) (involving a boat). A car is a place for purposes of this rule. *State v. Land*, 121 Wn.2d 494, 502 (1993). The purpose of viewing, however, is only to allow the jury to better understand the evidence produced in open court. *Portland-Seattle Auto Freight, Inc. v. Jones*, 15 Wn.2d 603, 614, 131 P.2d 736 (1942).

Christian Robinson contends he testified that he did not direct his attention to the other side of the car as opposed to testifying that he could not physically see events on the driver's side of the car. We disagree. Robinson testified to both. He initially testified he focused on his conduct and was frozen in fear rather than observing Shondell Buttram's behavior. He focused on Mariesha Seyler and Anastasia Roa, not driver Christian Salazar. Later his counsel asked as to his ability to see in the car. He responded that he could only see the backs of Roa and Seyler. This response called into question the dimensions of the car and one's ability to see from the passenger side over to the driver's side. Only later did Robinson respond that, after his view being obstructed, he saw Buttram and Salazar fighting. This later answer may suggest the lack of a factual question requiring a view, but Robinson's contradictory testimony merited further exploration by a jury view.

Christian Robinson next argues the trial court's allowance of a viewing contradicted the court's sustaining of the State's objection to defense questioning of Detective Wayne Downing. Defense counsel asked the detective about what might be visible in the Toyota if a person stood by the passenger door. Nevertheless, the trial court sustained the objection on the basis that defense counsel asked the question in the abstract without supplying needed details such as the height of the person, his position to the Toyota, and to what extent, if any, he squatted.

Christian Robinson maintains that the viewing was also improper because it constituted new evidence. He relies on *State v. Fricks*, 91 Wn.2d 391, 400, 588 P.2d 1328 (1979), in which the trial court denied Fricks' motion for the jury to view a gas station after dark because of conflicting testimony on the question whether a broken window could be seen from the sidewalk. The Supreme Court affirmed on appeal illustrating that the trial court possesses discretion, such that we might have affirmed Robinson's trial court if the court had rejected a request for a view. In *State v. Fricks*, the high court reasoned that the view of the gas station would have served to permit jurors to make a personal observation of whether the broken window could be seen from the sidewalk. The view would constitute new evidence and not simply an opportunity to clarify existing evidence.

We recognize a thin line between new evidence and clarifying evidence. But the trial court sits in a better position than us in drawing such a line. Because of the

49

testimony of Christian Robinson, the superior court did not abuse its discretion when allowing the view.

Christian Robinson asserts that the trial court erred in authorizing a jury view because admitted photographs and video provided sufficient evidence about the dimensions of the vehicle. He principally relies on *State v. Land*, 121 Wn.2d 494 (1993). The State charged Land with child molestation that occurred on his sailboat. Land argued that, due to the cramped layout and size of the boat's interior, the crimes could not have occurred as the victim described them. He requested that the jury view the sailboat. The trial court denied the motion because of the extensive testimony about the size of the sailboat and introduction of twelve photographs. The Supreme Court affirmed the trial court's exercise of discretion.

As does *State v. Frick*, *State v. Land* affords the superior court discretion when deciding whether photographs and testimony negates the utility of a jury view. In Christian Robinson's trial, the parties submitted limited testimony about the dimensions of the car. The video shown was taken from a distance with the truck blocking part of the Toyota. The photographs provided limited assistance in the dimensions of the Toyota.

Finally, Christian Robinson characterizes the condition of the Toyota, at the time of the jury view, as prejudicial because of blood and food wrappers. Robinson affords this court no photographs of the condition of the car at the time of the jury view. Nor did

any witness provide testimony of the condition of the car at the time of the view. Thus, we decline to address this contention.

Statement of Additional Grounds

In Christian Robinson's statement of additional grounds, he argues that ineffective assistance of defense counsel deprived him of the right to a fair trial. He maintains that counsel performed deficiently by waiving the court's consideration of a lesser included offense, by failing to object to the court instructing the jury on the elements of manslaughter, and by failing to object to the removal of the "wrongful act" language from the criminal negligence jury instruction, instruction 22. Robinson does not expand on his argument concerning the criminal negligence instruction, so we decline to address it.

Washington courts employ the two-part test adopted by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) to analyze claims of ineffective assistance of counsel. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). Under *Strickland*, the defendant must show both (1) deficient performance and (2) resulting prejudice to prevail on an ineffective assistance claim. *State v. Estes*, 188 Wn.2d 450, 457-58 (2017). Proving deficient performance requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance is performance falling

below an objective standard of reasonableness based on consideration of all the circumstances. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009); *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Proving prejudice resulted from counsel's deficient performance requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Christian Robinson argues that defense counsel's performance fell below the requisite standard due to counsel's decision to waive the inclusion of the lesser included offense jury instruction. During a case status hearing on May 23, 2022, defense counsel indicated it may be withdrawing the motion to include a lesser included offense, manslaughter, jury instruction. The court said "a lesser included is an appropriate instruction as part of the charging instruction at the end if you're going to give the lesser included." 2 RP (May 24, 2022) at 606. Defense counsel responded "And I don't think we are. I just will need a moment to confer." 2 RP (May 24, 2022) at 606. Counsel and Robinson conferred off the record. After speaking with Robinson, defense counsel informed the court that Robinson withdrew the lesser included offense motion and his proposed instructions for the lesser included offense. As a result, the trial court removed all proposed manslaughter jury instructions and struck from other jury instructions language referring to manslaughter.

52

No. 39068-3-III; consolidated with 39067-5-III
*State v. Robinson*

Assuming defense counsel's withdrawal of the lesser included offense motion and related proposed jury instructions constituted deficient performance that fell below an objective standard of reasonableness, Christian Robinson still must prove that he was prejudiced by such deficient performance to prevail on his ineffective assistance of counsel claim. Given the testimony heard by the jury and the exhibits introduced, the absence of a lesser included manslaughter instruction likely did not lead Robinson to being convicted of the higher second degree murder charge.

Christian Robinson cites *State v. Aten*, 79 Wn. App. 79, 900 P.2d 579 (1995), *aff'd*, 130 Wn.2d 640, 927 P.2d 210 (1996) when arguing that, because the criminal negligence instruction given to the jury in his case employs similar language to the second degree manslaughter instruction given to the jury in *Aten*, the trial court erroneously gave the jury an instruction on the elements of manslaughter. Robinson believes the following quote taken from *Aten* constituted the second degree manslaughter jury instruction in that case:

> In this case of second degree manslaughter, the criminal act is causing death through criminal negligence. A person acts negligently when she "fails to be aware of a substantial risk that a wrongful act may occur" and her lack of awareness "constitutes a gross deviation from the standard of care that a reasonable man would exercise in the same situation."

*State v. Aten*, 79 Wn. App. 79, 86 (1995) (footnotes omitted).

53

The language that Christian Robinson claims formed the jury instruction in *State v. Aten* was the Court of Appeals' decision, not the trial court's jury instruction. The decision does not aid Robinson.

CONCLUSIONS

We conclude the trial court committed only one nonprejudicial error and the trial prosecutor did not commit misconduct. We affirm Christian Robinson's conviction for second degree murder.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Pennell, J.